Case 1:01-cv-01104-RBW   Document 69-4   Filed 12/17/04   Page 1 of 29

KAUFFMAN vs. TEAMSTERS, AFL-CIO        NOV 16, 2004 DEPO OF: W. KAUFFMAN



0001
1              UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
2    _____
3    WILLIAM L. KAUFFMAN,          x
                                   :
4              Plaintiff,          :  Civil Action No.
          vs.                      :
5                                  :  1:01-cv-1104-RBW
     INTERNATIONAL BROTHERHOOD OF  :
6    TEAMSTERS, AFL-CIO,           :
                                   :
7              Defendant.          x
     _____
8
9                  Washington, D.C.
10                 Tuesday, November 16, 2004
11   DEPOSITION OF:
12             WILLIAM L. KAUFFMAN,
13   the plaintiff, was called for examination by counsel for
14   the defendant, pursuant to Notice and agreement of the
15   parties as to time and place, beginning at approximately
16   10:04 o'clock, a.m., at the law offices of Baptiste &
17   Wilder, Esquires, 1150 Connecticut Avenue, N.W., Suite
18   500, Washington, D.C., before Wanda L. Granger, CVR,
19   CCR, and A. Richard Obester, Court Reporters and
20   Notaries Public in and for the District of Columbia,
21   when there were present on behalf of the respective
22   parties:

0002
1    APPEARANCE OF COUNSEL:
2         On behalf of the Plaintiff:
3              NATHANIEL D. JOHNSON & ASSOCIATES, ESQUIRES
4              BY:  RICHARD L. THOMPSON II, ESQUIRE
5              1717 K Street, N.W., Suite 600
6              Washington, D.C.  20036
7              202/508-3645
8              rlt2esquire@aol.com
9         On behalf of Defendant:
10             BAPTISTE & WILDER, ESQUIRES
11             BY:  KATHERINE A. McDONOUGH, ESQUIRE
12                  WILLIAM R. WILDER, ESQUIRE
13             1150 Connecticut Avenue, N.W., Suite 500
14             Washington, D.C.  20036
15             202/223-0723
16             BapWild@aol.com
17                       - 0 -
18                  I-N-D-E-X
19   Witness:                              Page:
20   William L. Kauffman
21        Examination by Ms. McDonough         6
22                       - 0 -

0003

1    Exhibits:      (Not included in transcript)   Page:
2    1    Memorandum, dated 5-02-98 . . . . .   15
3    2    Memorandum, dated 2-22-98 . . . . .   17
4    3    Plaintiff's Responses to Defendant's
5         First Set of Interrogatories . .      27
6    4    First Amended Complaint . . . . . .   28
7    5    Letter, dated 5-22-98 . . . . . . .   52
8    6    Grievance . . . . . . . . . . . . .   54
9    7    Letter, dated 7-23-98 . . . . . . .   54
10   8    Letter, dated 9-09-98 . . . . . . .   57
11   9    Letter, dated 10-22-98 . . . . . . .  59
12                       - 0 -
13
14
15
16
17
18

19
20
21
22





COPY



(1) P-R-O-C-E-E-D-I-N-G-S (2) MS. MCDONOUGH: This is the matter of William (3) Kauffman versus the IBT. The witness is appearing here (4) by notice of deposition.

(5) Mr. Kauffman, my name is Katherine McDonough (6) and I represent the IBT in this lawsuit. With me here (7) today is William Wilder.

(8) Usually I ask the witness about whether they (9) have had any prior depositions. I know you had a state (10) court case against the IBT and you had a deposition in (11) that case; is that correct?

(12) THE WITNESS: That's correct.

(13) MS. MCDONOUGH: Have you had any other (14) depositions?

(15) THE WITNESS: No.

(16) MS. MCDONOUGH: We'll just go over some ground (17) rules for this morning. Your attorney may have gone (18) over them with you.

(19) The first thing is that you're under oath and (20) your testimony has the same force and effect as if (21) you're in a court of law.

(22) The other thing is that the court reporter

Page 5

(1) will be taking down everything that we say today, so we (2) want to help her out as much as possible. Speak up.

(3) Also, she's going to try and take down (4) everything that we say. And it's really hard to take (5) down what one person is saying; it's especially hard to (6) take down what two people are saying if they're talking (7) at the same time. So one person talks at a time.

(8) Try and avoid any non-verbal answers, too, (9) such as, "Uh-huh," or a shake of the head.

(10) And if you don't understand a question, just (11) let me know and I'd be happy to work with you to (12) rephrase.

(13) And finally, it sometimes happens that a (14) witness is taking medication or they have some sort of (15) illness that impairs their ability to recall events. So (16) any medication or any mental or physical condition that (17) would impair your ability to recall events?

(18) THE WITNESS: Not that I'm aware of.

(19) MS. MCDONOUGH: Okay.

(20) MR. THOMPSON: If I may, Counsel.

(21) From time to time during the deposition, I'm (22) probably going to object. Unless I direct you not to

Page 6

(1) answer, ignore me completely.

(2) MS. MCDONOUGH: And that will make things go (3) faster, too. That was going to be my next point.

(4) Whereupon, (5) WILLIAM L. KAUFFMAN, (6) was called as a witness, and after having first been (7) duly sworn by the Notary Public, was examined and (8) testified as follows:

(9) EXAMINATION BY COUNSEL FOR DEFENDANT (10) BY MS. MCDONOUGH:

(11) Q. Mr. Kauffman, you're employed by UPS?

(12) A. At this current time?

(13) Q. No. Let's start out, you were a package (14) driver with UPS?

(15) A. Yes.

(16) MR. THOMPSON: Objection to scope of time.

(17) BY MS. MCDONOUGH:

(18) Q. When were you employed?

(19) A. I started in 1977.

(20) Q. And did you work there until you came to work (21) for the International Brotherhood of Teamsters?

(22) A. Yes.

Page 7

(1) Q. When did you work for the IBT; when did you (2) come to work for the IBT?

(3) A. I started the IBT in May of 1992.

(4) Q. Who hired you?

(5) A. Mario Perrucci.

(6) Q. Can you spell Mr. Perrucci's last name.

(7) A. P-e-r-r-u-c-c-i.

(8) Q. What was your position with the IBT?

(9) A. International representative.

(10) Q. When you were working for UPS, you were (11) represented by Teamsters Local 177?

(12) A. Yes.

(13) Q. And that was in New Jersey?

(14) A. Yes.

(15) Q. And you were a participant in the Local 177 (16) UPS pension plan?

(17) A. Yes.

(18) Q. When did you vest in the Local 177 UPS pension (19) plan?

(20) A. I don't know the exact date.

(21) Q. Okay. But you were vested?

(22) A. Yes.

Page 8

(1) Q. Okay, that's fine.

(2) And when you began working for the IBT, were (3) you still living in New Jersey?

(4) A. Yes.

(5) Q. And you commuted to D.C.?

(6) A. Yes.

(7) Q. And for how long did that situation exist?

(8) A. I believe in early or mid '93 my (9) responsibilities required me to be in the District.

(10) Q. And then did you -- in mid '93, did you take a (11) residence in the District of Columbia?

(12) A. You have to define "residence" for me.

(13) Q. Okay. Were you living in an apartment?

(14) A. In '93, I believe for a short period I was (15) renting -- I mean staying in hotel rooms.

(16) Q. And then after that short period where you (17) were staying in hotel rooms, did you take an apartment?

(18) A. Yes. I submitted a proposal to the IBT.

(19) Q. And what was that proposal?

(20) A. Basically because of the amount of time that I (21) spent in the District, it would be cost-effective to (22) live in an apartment, as opposed to paying exorbitant

Page 9

(1) hotel costs.

(2) Q. Okay. And were you given a housing allowance (3) for that apartment?

(4) A. Initially, I was told to submit it with my (5) monthly expenses and I got reimbursed.

(6) Q. What was the amount of that reimbursement?

(7) A. I don't know the exact dollar.

(8) Q. Okay, just approximate.

(9) A. Somewhere between $800 and $950.

(10) Q. When did you move from that apartment?

(11) A. I don't -- I'm not sure.

(12) Q. Okay. Where did you go when you moved? Let's (13) start there.

(14) A. I moved to another apartment.

(15) Q. Were you still being reimbursed by the IBT?

(16) A. Initially, yes; and then I believe mid '94 (17) they stopped reimbursing me.

(18) Q. In mid '94, did you still have a residence in (19) New Jersey?

(20) A. Yes.

(21) Q. Do you still have that residence in New (22) Jersey?

Page 10

(1) A. No, I do not.

(2) Q. When did you --

(3) A. You're speaking of the one that I had --

(4) Q. That you had in mid '94.

(5) A. No, I don't.

(6) Q. When did you give up that residence in New (7) Jersey?

(8) A. I was forced to sell it in -- let me see. I (9) put it on the market in late '98, and I believe I closed (10) on it after the first of the year.

(11) Q. Did you at anytime inform the IBT that you had (12) a residence in Virginia?

(13) A. Yes.

(14) Q. When did you inform them of that?

(15) A. I don't know the exact date. I believe it was (16) mid '95.

(17) Q. Was that a home or an apartment?

(18) A. That was an apartment.

(19) Q. Did you own or did you rent that residence in (20) Virginia?

(21) A. That was a rental.

(22) Q. After you took the residence in Virginia in

Page 11

(1) mid '95, were you paying Virginia or New Jersey income (2) tax?

(3) A. I don't know.

Case 1:01-cv-01104-RBW   Document 69-4   Filed 12/17/04   Page 4 of 29

KAUFFMAN vs. TEAMSTERS, AFL-CIO                NOV 16, 2004 DEPO OF: W. KAUFFMAN

(4) Q. Did anyone at the IBT ever tell you that as a (5) condition of your employment that you would be required (6) to relocate to Washington, D.C.?

(7) A. I had a discussion with Mario Perrucci prior (8) to coming to D.C. full-time that I would need money to (9) offset my living expenses.

(10) Q. Did Mr. Perrucci indicate that you would have (11) to relocate to D.C. in order to keep your job with the (12) IBT?

(13) A. I don't believe we discussed that.

(14) Q. Did anyone else tell you that you'd have to (15) move to D.C. to keep your job with the IBT?

(16) A. I only worked for Mr. Perrucci.

(17) Q. So the answer to that is no?

(18) A. No.

(19) Q. Mr. Kauffman, in your responses to Defendant (20) IBT's interrogatories you went through and identified (21) your duties while you were employed by the IBT, and I'd (22) just like to go through those very quickly.

Page 12

(1) One thing you indicated was that you were (2) responsible for responding to member inquiries and local (3) union requests for information.

(4) From what period of time did you perform that (5) duty?

(6) A. It began basically in '92 after I reported to (7) the division.

(8) Q. Did that duty continue until your employment (9) with the IBT terminated?

(10) A. For the most part, except that there is a (11) reduction in the amount of that in the last, maybe, (12) year.

(13) Q. What was that reduction due to?

(14) A. Well, one thing, I was removed from having a (15) presence at two panels.

(16) Q. Okay, we'll get to that. That's fine.

(17) And you indicated that you were a liaison to (18) the northwest regional UPS contract negotiations. What (19) did that involve?

(20) A. That involved traveling to Seattle for (21) contract negotiations for the — I believe it was the (22) '93-to-'97 contract period, being involved with their

Page 13

(1) negotiations as far as providing them with any (2) information that I could get from the International, but (3) I was not a member of the committee.

(4) Q. And you provided local unions with decisions (5) from previous panels and contract guidance; is that (6) correct?

(7) A. I'm not clear on that question.

(8) Q. Okay. I guess that goes to just providing (9) local unions with panel decisions when they ask for (10) them?

(11) A. Yeah; because by working in the division, I (12) had an opportunity to read previous panel decisions. (13) And if there was an issue that was similar to (14) any particular supplemental panel, then I'd get that (15) decision and send it to them.

(16) Q. Was that an ongoing duty while you were (17) employed by the IBT?

(18) A. Pretty much so, yes.

(19) Q. And you had some duties involved with the (20) National Air Grievance Panel?

(21) A. Yes.

(22) Q. What were those?

Page 14

(1) A. My job at the air panel basically was to run (2) the tape recording and take the notes.

(3) Q. From what period of time did you perform those (4) duties?

(5) A. I believe it was probably the majority of the (6) time. There were a few situations where I would sit (7) with either the main panel or the health and safety, but (8) most of my time was spent with the air committee.

(9) Q. And I was just looking for the years that you (10) performed that duty.

(11) A. I believe like '93 up until my termination.

(12) Q. And you were the trustee -- one of the (13) trustees for the Teamster UPS 401(k) plan?

(14) A. Yes.

(15) Q. What period of time?

(16) A. From 1994 up until my termination.

(17) Q. And you were co-chair of the Kentucky

(18) Grievance Panel?

(19) **A. Yes.**

(20) Q. What did your duties involve there?

(21) **A. Along with representatives of the other two (22) unions, we would sit and hear grievances.**

**Page 15**

(1) Q. You said the other two unions. Which unions (2) are you referring to?

(3) **A. There are two local unions in Kentucky: one, (4) Local 89, and I believe the other one was 652 — 651, I (5) think.**

(6) Q. There were employer representatives on those (7) panels, as well?

(8) **A. Yes.**

(9) Q. Was there a neutral chairman?

(10) **A. No.**

(11) (Kauffman Deposition Exhibit (12) Number 1 was marked for (13) identification.)

(14) BY MS. MCDONOUGH:

(15) Q. Mr. Kauffman, I'm going to show you what's (16) been marked as Exhibit 1. (Handing document.)

(17) If you'll take a minute and review that.

(18) **A. (Perusing document.)**

(19) Q. Do you recognize this as a memorandum that you (20) sent to Ken Hall?

(21) **A. Yeah. Periodically, I would report back to (22) Ken some of the things that occurred while I was on the**

**Page 16**

(1) **road at various assignments.**

(2) Q. And Exhibit 1 refers to two cases that you had (3) while you were co-chair of the Kentucky panel?

(4) **A. Yes.**

(5) Q. The first paragraph here relates to a (6) discharge case. What was the panel's ruling in that (7) discharge case?

(8) **A. I don't know.**

(9) Q. What was the reason for the discharge in that (10) case?

(11) **A. It appears it was a sex harassment case.**

(12) Without the other documents, it's hard to tell exactly (13) what transpired.

(14) Q. Okay. And you don't recall the panel's

ruling (15) at this time?

(16) **A. Not specifically, no.**

(17) MR. THOMPSON: I'd like to just lodge an (18) objection that it's not reasonably likely to lead to the (19) discovery of admissible evidence.

(20) BY MS. MCDONOUGH:

(21) Q. Do you recall whether you personally voted to (22) uphold the discharge in that case referenced in

**Page 17**

(1) paragraph one of this memo?

(2) **A. I don't recall.**

(3) Q. How about paragraph two, do you recall the (4) case that's referenced there?

(5) **A. Nothing specific about this case that rings a (6) bell.**

(7) (Kauffman Deposition Exhibit (8) Number 2 was marked for (9) identification.)

(10) BY MS. MCDONOUGH:

(11) Q. Mr. Kauffman, I have put before you Exhibit 2.

(12) If you'd just take a moment to review that.

(13) **A. (Perusing document.)**

(14) Q. Do you recognize this document?

(15) **A. Yes.**

(16) Q. Is this a memo that you sent to Ken Hall?

(17) **A. Yes; after consultation with counsel.**

(18) Q. And I'd like to refer your attention to (19) paragraph three of this memo. It refers to a 1997 case (20) with Brad Borders of Local 651. Do you recall that (21) case?

(22) **A. (Perusing document.) I believe it's — yeah,**

**Page 18**

(1) **I recall the case.**

(2) Q. What was the panel's ruling in Mr. Borders' (3) case?

(4) **A. I believe — I don't know the exact language (5) of the ruling. There were two outstanding cases with (6) this individual, and I believe this is the one referring (7) to an ADA-related issue.**

(8) Q. What was the other case that this individual (9) had?

(10) **A. The other one that stands out is**

regarding (11) **coming to Washington to count votes for the election.**

(12) Q. Focusing on the ADA case, what specifically --

(13) what relief was Mr. Borders seeking?

(14) **A. I believe he was requesting a** (15) **reasonable accommodation.**

(16) Q. What was that accommodation?

(17) **A. It had something to do with his job as a** (18) **feeder driver. I don't remember all of the specifics.**

(19) Q. Did you vote to uphold or deny Mr. Borders' (20) grievance?

(21) **A. I believe in that case he needed additional** (22) **information to support his claim, so it was not denied.**

**Page 19**

(1) Q. You're saying it was not -- his claim was not (2) denied?

(3) **A. His ADA claim was not denied.**

(4) Q. Were there any procedural issues related to (5) Mr. Borders' grievance?

(6) **A. I can't recall all of that.**

(7) Q. I'm just wondering. I'm just a little (8) confused.

(9) In the second sentence of this paragraph, you (10) say, "As you will recall, his grievance was denied in (11) that matter." What are you referring to there?

(12) **A. Because, if I'm not mistaken, that's what --**

(13) there was a, I guess, dispute with regards to the (14) decision in that complaint.

(15) It was only denied in the extent that he had (16) to go back and get additional information to support his (17) ADA claim that was open -- wide open for him.

(18) Q. Okay. If I'm understanding you then, there (19) was an initial decision by the panel in which the ruling (20) was that he needed additional information to support (21) this ADA claim that he had, and you're saying he had the (22) ability to come back to the panel with a grievance and

**Page 20**

(1) have additional information; is that right?

(2) **A. He didn't have to file another**

grievance. He (3) **needed only to provide the supporting medical** (4) **documentation that he needed. That was my understanding** (5) **of the decision.**

(6) Q. You had another union counterpart on that (7) panel with you?

(8) **A. Yes.**

(9) Q. Did the other union counterpart join in the (10) panel's ruling that Mr. Borders should come back to the (11) panel with additional medical information?

(12) **A. To the best of my knowledge, yes.**

(13) Q. So you and the union counterpart, your union (14) -- who was your co-chair for the panel with Mr. Borders; (15) do you recall?

(16) **A. I don't recall his name.**

(17) Q. Was Mr. Borders -- did he ever come back to (18) the panel with the additional medical information that (19) you're claiming was needed?

(20) **A. I don't know. I didn't -- I wasn't present to** (21) **hear any other case.**

(22) Q. You were removed from the Kentucky panel; is

**Page 21**

(1) that correct?

(2) **A. Yes.**

(3) Q. When did that occur?

(4) **A. Based on this memo, it was probably late** (5) **'97/early '98.**

(6) Q. How were you informed that you were removed (7) from the Kentucky panel?

(8) **A. I think, initially, a union official had come** (9) **into the office and made a comment to me that he heard** (10) **that I had been fired.**

(11) Q. Do you recall who that union official was?

(12) **A. Joe Pierani, I believe, P-i-e-r-a-n-i.**

(13) Q. Did you ask Mr. Pierani what was the basis of (14) the rumor, why he believed you had been fired?

(15) **A. I believe I may have asked him one or two** (16) **quick questions. His response was something to the** (17) **effect that he had just returned from the central** (18) **conference grievance panel and that's what he had heard.**

Case 1:01-cv-01104-RBW   Document 69-4   Filed 12/17/04   Page 7 of 29

KAUFFMAN vs. TEAMSTERS, AFL-CIO        NOV 16, 2004 DEPO OF: W. KAUFFMAN

(19) Q. Did he indicate from whom he had heard that (20) rumor?

(21) A. Not by name.

(22) Q. What did you do after you spoke with Mr.

**Page 22**

(1) Pierani?

(2) A. I don't know if I spoke to Mr. Hall right away (3) or I spoke to counsel at that time.

(4) Q. Okay. Well, I'm not interested in your (5) conversations with counsel. Those are privileged.

(6) But did you have a discussion with Mr. Hall?

(7) A. I don't recall having one with him, not (8) immediately.

(9) Q. But at some point you learned that the rumor (10) that you had been fired was not true. How did you find (11) that out?

(12) A. I don't know exactly, other than nothing was (13) ever communicated to me officially.

(14) Q. Did you ever have any conversations with Mr.

(15) Hall concerning your removal from the Kentucky panel?

(16) A. I eventually had, maybe, a minute or two (17) conversation with him, I believe.

(18) Q. What did Mr. Hall saying during that (19) conversation?

(20) A. I don't want to guess at it, but I believe an (21) appropriate summary would be that he wanted to put (22) someone on the panel.

**Page 23**

(1) Q. Did he tell you why he wanted to put someone (2) else on the panel?

(3) A. I don't recall.

(4) Q. Who was placed on the panel?

(5) A. I believe Trish Callahan was reassigned.

(6) Q. You say reassigned. Had she had that position (7) in the past?

(8) A. Yeah; initially, she worked as co-chair of (9) that panel.

(10) Q. Prior to you?

(11) A. Yes.

(12) Q. And is Ms. Callahan -- was she another (13) international representative?

(14) A. Yes.

(15) Q. Did anyone from the IBT inform you why Ms.

(16) Callahan was being put on the panel in place of you?

(17) A. No.

(18) Q. Do you recall any other conversations with (19) anyone at the IBT about Ms. Callahan being placed on the (20) Kentucky panel?

(21) A. Not that I can recall, no.

(22) Q. You indicated in your interrogatory responses

**Page 24**

(1) that you served on the southern area regional grievance (2) panel?

(3) A. I didn't serve on the panel. I was liaison.

(4) Q. You were liaison, okay. What did your duties (5) involve?

(6) A. Again, communicating information from the (7) division, retrieving decisions.

(8) Q. What period of time did you serve on that (9) panel -- or as a liaison to that panel?

(10) A. I believe it was from mid 1993 until I was (11) removed in '97.

(12) Q. How did you learn that you were removed?

(13) A. I was told.

(14) Q. By whom?

(15) A. Ken Hall.

(16) Q. What did Mr. Hall tell you about why you were (17) being removed?

(18) A. I recall something to the effect that because (19) Mr. Candler had been a sitting panel member at a (20) different panel, that he wanted him down there.

(21) Q. What's Mr. Candler's first name?

(22) A. Ron.

**Page 25**

(1) Q. Was he another international representative?

(2) A. Yeah. He got hired in '95 or '96, I believe.

(3) Q. Did Mr. Hall indicate that there was any

(4) problem with your performance on the southern area (5) regional grievance panel?

(6) A. No. In fact, I had asked him on more than one (7) occasion how I was doing and he said fine.

(8) Q. Did you have any other conversations with (9) anyone at the IBT concerning your removal from the (10) southern area regional grievance panel?

(11) A. I don't know. Can you clarify; what do you (12) mean by any other discussions?

(13) Q. Any conversations with anyone at the IBT (14) regarding your removal from that panel.

(15) A. I don't recall.

(16) Q. Are there any other duties that you had as an (17) international representative with the IBT that we (18) haven't discussed so far?

(19) A. I can't think of anything else at the moment.

(20) Q. What was your beginning salary at the IBT?

(21) A. Base salary, I believe, was $62,5-.

(22) Q. We've talked about the elimination of your

Page 26

(1) housing allowance. Other than the elimination of the (2) housing allowance, were there any other reductions in (3) your salary?

(4) A. Base salary, no.

(5) Q. Any reductions in your compensation at all (6) other than the housing allowance?

(7) A. Well, there's the issue regarding my pension (8) from 177.

(9) Q. Okay, we'll get to that.

(10) A. All right. And, of course, when you're not (11) traveling, there is an impact on your income because you (12) don't get travel expense or those allowances.

(13) Q. Did you receive any raises while you were at (14) the IBT?

(15) A. The only raise I received was a raise that was (16) given, I believe, in November of '98.

(17) Q. How much was that raise?

(18) A. I believe it was only a $5,000 increase of (19) which I only received a portion.

(20) Q. You only received a portion of the

$5,000 (21) increase?

(22) A. Yes.

Page 27

(1) Q. What do you mean by that?

(2) A. I was terminated in March, so I didn't get the (3) full benefit.

(4) (Kauffman Deposition Exhibit (5) Number 3 was marked for (6) identification.)

(7) BY MS. MCDONOUGH:

(8) Q. Mr. Kauffman, I have marked as Exhibit 3 your (9) answers to the Defendant's interrogatories, and I would (10) like specifically to refer to interrogatory number 2, (11) which is on page 4. (Handing document.)

(12) A. (Perusing document.)

(13) Q. In response to that interrogatory, you've (14) identified five documents which you contend controlled (15) your employment at the IBT.

(16) And my question is simply: Other than what's (17) listed there in your response to interrogatory number 2, (18) can you think of any other documents that may have (19) controlled the terms and conditions of your employment (20) at the IBT?

(21) A. (Perusing document.) Not off the top of my (22) head, no.

Page 28

(1) Q. When you were hired by the IBT, were you told (2) that your employment would terminate on a specified (3) date?

(4) A. No. I was told that my leave of absence would (5) be the same as anyone else in Local 177, which has a (6) practice of lifetime leave of absence.

(7) Q. Who told you that?

(8) A. Mario Perrucci.

(9) Q. So there was no agreed-upon ending date for (10) your employment with the IBT?

(11) A. No. We didn't view it as necessary. It was (12) my option if I wanted to return to UPS.

(13) Q. Other than the statements by Mr. Perrucci, (14) were there any other conversations with anyone about the (15) length of your employment at the IBT?

(16) A. No.

(17) (Kauffman Deposition Exhibit (18) Number 4

was marked for (19) identification.)
(20) BY MS. MCDONOUGH:
(21) Q. Mr. Kauffman, I have marked for Exhibit 4 the (22) -- as Exhibit 4 the amended complaint in this matter.

**Page 29**
(1) (Handing document.)
(2) If you would just turn to the back page of
(3) this document.
(4) **A. (Complying.)**
(5) Q. Is that your signature there?
(6) **A. (Perusing document.)  Yes, it is.**
(7) Q. And if you would turn to page 7 of this
(8) document and, specifically, paragraph 35 --
(9) **A. Uh-huh.**
(10) Q. -- you refer here to comments made by Gloria (11) Stewart.
(12) **A. Yes.**
(13) Q. Who is Ms. Stewart?
(14) **A. At the time, she was a -- I guess an**
(15) **administrative assistant.  I'm not sure of her title.**
(16) Q. So, certainly, she didn't have any supervisor (17) authority over you?
(18) **A. No.**
(19) Q. You refer here to comments that Ms. Stewart (20) made.  What were those comments?
(21) **A. She made a comment about my level of (22) compensation.**

**Page 30**
(1) Q. Did Ms. Stewart make any reference to your (2) race in the context of that comment?
(3) **A. It was the manner in which she made those (4) comments.**
(5) **My income was no more than any other (6) individual employed at the IBT, and why she would single (7) me out didn't make sense.**
(8) Q. If you would just listen to the question that (9) I'm asking and answer that, I think things will go more (10) quickly this morning.
(11) Did you reference your race when she was (12) speaking to you?
(13) **A. No; she didn't reference my race.**
(14) Q. Did Ms. Stewart use a racial slur or racial (15) epithet when she was speaking to you?

(16) **A. No.  But I can only tell you it was the manner (17) in which she spoke to me.**
(18) Q. If you would turn to page 9 of the amended (19) complaint --
(20) **A. Uh-huh.**
(21) Q. -- and, specifically, paragraph 57.  You refer (22) to comments made by Trish Callahan.

**Page 31**
(1) **A. Yes.**
(2) Q. What was the comment that Ms. Callahan made?
(3) **A. Ms. Callahan took exception to my getting a (4) housing allowance.**
(5) Q. Did Ms. Callahan make any reference to your (6) race?
(7) **A. I believe by singling me out in a meeting of (8) that nature to talk about my level of compensation.**
(9) Q. But again, as with Ms. Stewart, I just want (10) you to listen to the question and answer it.
(11) Was there any reference to your race or to the (12) color of your skin?
(13) **A. Can you define "reference"?**
(14) Q. I think the question is very plain, Mr. (15) Kauffman.
(16) Was she referring to the color of your skin; (17) did she refer to the fact that you're an African-
(18) American?
(19) **A. Did she say those things?  No.**
(20) Q. Did Ms. Callahan use any racial epithets or (21) slurs?
(22) **A. Not in that particular meeting, no.**

**Page 32**
(1) Q. Did Ms. Callahan at anytime while you were (2) employed at the IBT use a racial slur or epithet in your (3) presence?
(4) **A. I know that there were comments made, but I (5) don't know specifically if they were by her or if she (6) was in the room when they were made.**
(7) Q. Were you present when those comments were (8) allegedly made?
(9) **A. At least once, I was.**
(10) Q. What was the slur or epithet that was used by (11) Ms. Callahan?

**KAUFFMAN vs. TEAMSTERS, AFL-CIO**

**NOV 16, 2004 DEPO OF: W. KAUFFMAN**

(12) **A. I don't know the exact words; something (13) referencing black employees at the IBT.**

(14) Q. Where were you and Ms. Callahan?

(15) **A. What do you mean?**

(16) Q. When she allegedly made a comment referencing (17) black people -- black employees at the IBT.

(18) **A. I guess within the office environment, there (19) are three offices that are side by side.**

(20) I'm not sure if I was sitting at my desk and (21) she was in another office talking with other people and (22) -- on occasions, you overhear things.

Page 33

(1) Q. So was Ms. Callahan speaking to you?

(2) **A. She wasn't speaking to me directly.**

(3) Q. To whom was she speaking?

(4) **A. It may have been the other secretaries or (5) someone may have come into the office. I didn't know.**

(6) I didn't go look.

(7) Q. To the best you can recall, what did Ms.
(8) Callahan say?

(9) **A. I think at one point there was some discussion (10) about the -- what was referred to as the pool nurses who (11) worked in an office down the hall. There were, I think, (12) one or two black ladies and one Latin American lady.**

(13) Q. And she was referencing these nurses?

(14) **A. The secretaries.**

(15) Q. So Ms. Callahan was referencing the (16) secretaries?

(17) **A. It was something, I guess, that had occurred.**

(18) I didn't really listen to the whole conversation.

(19) THE WITNESS:  May I take a men's room break?

(20) MS. MCDONOUGH:  Let's just finish this line of (21) questioning and then we'll -- you can take a break.

(22) MR. THOMPSON:  Actually, you have no question

Page 34

(1) on the table.  We've got all morning and all day.  If (2) he's got to go to the bathroom, he's got to go to the (3) bathroom.

(4) MS. MCDONOUGH:  I think we can finish this up (5) very quickly, and then we can allow him to take a break.

(6) BY MS. MCDONOUGH:

(7) Q. I just want to know what Ms. Callahan said.

(8) **A. I can't give you specific words of what was (9) said.**

(10) And considering the amount of time that has (11) passed, I can only say that I believe I heard something (12) that was inappropriate and it referenced the secretaries (13) that worked in one of the other offices.

(14) Q. Can you recall a specific slur or epithet that (15) Ms. Callahan used?

(16) **A. Not right at this moment.  You know, again, (17) it's been some time.**

(18) MS. MCDONOUGH:  Okay, I think we can take a (19) break now.

(20) (Whereupon, a brief recess was taken.)

(21) BY MS. MCDONOUGH:

(22) Q. If you want to turn to paragraph 74 of the

Page 35

(1) complaint which is on page 11 -- let's go back just a (2) little bit before we get to paragraph 74.

(3) If you want to turn to paragraph 65, and there (4) you reference a conversation between Patricia Callahan (5) and the division attorney, Cristy Hoffman.

(6) **A. Yes.**

(7) Q. In the context of that conversation, was there (8) any mention of race?

(9) **A. In that short conversation, not that I can (10) recall.**

(11) Q. And is Ms. Callahan an attorney?

(12) **A. I believe she has a law degree. Whether or (13) not she's practicing or not, I couldn't answer that.**

(14) Q. And how far away were you from Ms. Callahan (15) and Ms. Hoffman when you overheard the conversation (16) referenced in paragraph 65?

(17) **A. I was sitting at the next desk.  Trish**

Case 1:01-cv-01104-RBW   Document 69-4   Filed 12/17/04   Page 11 of 29

KAUFFMAN vs. TEAMSTERS, AFL-CIO          NOV 16, 2004 DEPO OF: W. KAUFFMAN

and I (18) **shared offices.**

(19) Q. And Ms. Callahan and Ms. Hoffman were talking (20) about constructive discharge; is that correct?

(21) **A. Yeah.  Trish Callahan had asked her what was a (22) constructive discharge.**

---

**Page 36**

(1) Q. Did you hear anything else of their (2) conversation?

(3) **A. I believe Cristy started to explain to her (4)  what it was, and I left the office.**

(5) Q. Do you recall anything else about that (6) conversation?

(7) **A. No.**

(8) Q. Now, if you would turn to paragraph 74.

(9) **A. (Complying.)**

(10) Q. In here you reference comments made by Gabe --

(11) **A. -- Ybarrolozza.**

(12) Q. Okay.  We'll have to have you spell that.

(13) **A. Y-b-a-r-r-o-l-o-z-z-a.**

(14) Q. And what were his comments?

(15) **A. He, basically, kind of shouted out, "Hey, (16) Willie, how much do you make," or made some (17) inappropriate comments regarding my level of (18) compensation.**

(19) Q. Is Mr. Ybarrolozza --

(20) **A. Ybarrolozza.**

(21) Q. -- okay -- is he an employee of the IBT?

(22) **A. No; he was a local union business agent.**

---

**Page 37**

(1) Q. Do you recall any other comments that Mr.

(2) Ybarrolozza may have made during the context of the (3)  conversation referenced in paragraph 74?

(4) **A. Initially, I didn't hear him.  I just knew he (5)  was talking to me.  And I asked, "What did you say," and (6)  then he repeated it.**

(7) And he said something else, and my only other (8)  response was that that was not the issue to be discussed (9)  in panel.

(10) Q. So he referenced your compensation and you (11) said that's not the issue to be

discussed at the panel.

(12) Is there anything else that you recall?

(13) **A. There were about seven, maybe eight other (14) individuals in the room that clearly heard him.**

(15) **They were all caucasian, and at least half of (16) them turned red.  They probably all had incomes that far (17) exceeded mine.**

(18) Q. Any mention of your race by Mr. Ybarrolozza?

(19) **A. He didn't say it in words.  Again, I was the (20) only person singled out in a room of caucasians.**

(21) Q. Any racial slurs or epithets used by Mr. (22) Ybarrolozza?

---

**Page 38**

(1) **A. No.**

(2) Q. While you were employed by the IBT, did Ms.

(3) Callahan have any supervisory authority over you?

(4) **A. None had been communicated to me.**

(5) Q. And she had the same position as you; she was (6)  an international representative?

(7) **A. Yeah.**

(8) Q. Are there any other comments that you consider (9)  to be racially motivated made by agents or employees of (10) the IBT?

(11) **A. Towards me or just in general?  I'm not clear.**

(12) Q. Let's start with towards you.

(13) **A. I think not so much in comments that I can (14) recall directly.**

(15) Q. Beyond what you have -- the allegations you've (16) made in the complaint, can you think here today of any (17) racial slurs or epithets that were used by agents or (18) employees of the IBT?

(19) **A. Yes.  I've heard the cook in the kitchen (20) referred to as a "camel jockey," and I've heard Asian (21) Americans referred to as "cookies" or "fortune cookies."**

(22) Q. With regard to the comment made about the

---

**Page 39**

(1) cook, who made that comment?

(2) **A. I believe that was made by the**

Case 1:01-cv-01104-RBW   Document 69-4   Filed 12/17/04   Page 12 of 29

KAUFFMAN vs. TEAMSTERS, AFL-CIO                NOV 16, 2004 DEPO OF: W. KAUFFMAN

secretary in (3) the office at that time.

(4) Q. And with respect to the comment regarding (5) Asian Americans, who made that comment?

(6) A. I, in the past, had heard that from the same (7) secretary, but someone else had made a comment -- a (8) passing comment once that I overheard not in my (9) immediate office.

(10) Q. Do you recall who that was?

(11) A. No, I don't.

(12) Q. Anything else that you recall?

(13) A. Not off the top of my head, no.

(14) Q. When you began working for the IBT, your (15) immediate supervisor was Mr. Perrucci; is that correct?

(16) A. Yes.

(17) Q. And then at sometime later, Mr. Perrucci was (18) replaced by Mr. Hall?

(19) A. Yes.

(20) Q. What time did that occur?

(21) A. I believe it was mid to late 1995.

(22) Q. Was there any level of supervision in between

Page 40

(1) you and Mr. Hall?

(2) A. Not officially.  But I was well-aware that, I (3) guess for lack of a better term, Trish Callahan was more (4) of a confidante and -- for whatever reason.

(5) Q. Your duties were exclusive to the small (6) package division of the IBT?

(7) A. Yes.

(8) Q. Other than the -- obviously, the (9) administrative staff, the international representatives (10) and Mr. Hall, what other positions were there in the (11) division?

(12) A. In the division?

(13) Q. Uh-huh.

(14) A. At that time, there were none.

(15) Q. When Mr. Hall was heading the division?

(16) A. Yeah.  It was just him as director and (17) international representatives.

(18) Q. Did this staffing component change at anytime?

(19) A. Not until after my termination and an (20) assistant director position was created.

(21) Q. How did you learn about the creation of the (22) assistant director position?

Page 41

(1) A. Probably just reading the media, news (2) articles, general conversation with people in and around (3) the country that I'd meet and had contact with.

(4) Q. Your termination occurred in March of --

(5) A. -- '99.

(6) Q. -- '99.  How much longer after you were (7) terminated did you learn of the creation of the (8) assistant director position?

(9) A. It may have been within a couple of months.

(10) Q. If you would turn back to the amended (11) complaint, which is Exhibit 4 -- before we turn to that, (12) let me just ask you, were there any positions that you (13) applied for that were promotions?

(14) A. There were no positions that were ever posted (15) as being vacant.  Had there been some, I would have (16) applied.

(17) Q. If you would just turn to paragraph 51 of the (18) amended complaint --

(19) A. (Complying.)

(20) Q. -- and here you allege that international (21) representatives were expected to pledge $1,000 per month (22) to the Carey campaign.

Page 42

(1) A. Yes.

(2) Q. Who communicated that expectation to you?

(3) A. Trish Callahan.

(4) Q. Who was present when she communicated that (5) expectation to you?

(6) A. It was just she and I.

(7) Q. Did she approach you about this $1,000 pledge (8) more than once?

(9) A. She only said it to me once, and my basic (10) response was that I'm not involved.

(11) Q. Did anyone else at the IBT approach you about (12) donating money to the Carey campaign?

(13) A. Yes.

(14) Q. Who was that?

(15) A. Once, Joe Bales-Henry, another

Case 1:01-cv-01104-RBW    Document 69-4    Filed 12/17/04    Page 13 of 29

KAUFFMAN vs. TEAMSTERS, AFL-CIO                    NOV 16, 2004 DEPO OF: W. KAUFFMAN

international (16) representative, had given me a little card that had an (17) address on it for the -- excuse me, for the Carey (18) campaign.

(19) Then after the election, Vice President Aaron (20) Belk called me and, again, I refused to get involved.

(21) Q. Okay. Who was present when Mr. -- is it (22) Henry?

**Page 43**

(1) A. Uh-huh.

(2) Q. Who was present when Mr. Henry approached you (3) with the card for the Carey campaign?

(4) A. No one. In each instance, it appeared as (5) though they waited until I was isolated.

(6) Q. So when Mr. Henry gave you this card with the (7) address for the Carey campaign, did he say anything when (8) he gave you this card?

(9) A. Well, it just said, "Carey Campaign" on it.

(10) He didn't say anything about any dollar amount.

(11) Q. Did he say words to the effect that you were (12) expected to donate money to the Carey campaign or did he (13) just hand you the card?

(14) A. He, basically, just handed me the card.

(15) Q. And no one was present in the room with you (16) when Mr. Belk called?

(17) A. No.

(18) Q. Did there appear to be anyone else on the line (19) besides you and Mr. Belk?

(20) A. I don't know.

(21) Q. What did Mr. Belk say?

(22) A. He, basically, said that he was calling to ask

**Page 44**

(1) for contributions to reduce the campaign debt.

(2) Q. Did you understand him to be referring to Mr.

(3) Carey's campaign?

(4) A. At that point, I believed that that's

who he (5) was referring to because he was part of the Carey (6) administration.

(7) But it didn't matter because I had previously (8) refrained from getting involved in those activities.

(9) Q. Any other instances where you were asked to (10) contribute money to the campaign of Ron Carey?

(11) A. Those were the only three instances with (12) regard to Ron Carey.

(13) I was approached on the road by various union (14) officials asking for my support for Mr. Hoffa and, (15) again, I refrained.

(16) Q. Which union officials approached you about (17) supporting Mr. Hoffa?

(18) A. I don't know by name. But I can tell you that (19) there was one official from Oklahoma that had approached (20) me. I believe there may have been one from Texas.

(21) Q. And when you say an official from Oklahoma, (22) are you referring to a representative of a local union

**Page 45**

(1) in Oklahoma?

(2) A. Yes.

(3) Q. I wasn't even aware that IBT had a local in (4) Oklahoma.

(5) And again, with the official from Texas, are (6) you referring to a representative of a local union in (7) Texas?

(8) A. Local union, yes.

(9) Q. And when these officials approached you about (10) supporting Hoffa, was it your understanding that they (11) were referring to financial support?

(12) A. Yes.

(13) Q. What gave you that impression?

(14) A. Past experience and knowledge in the IBT:

(15) campaigns cost money.

(16) Q. Did they make a specific reference of donating (17) money to the Hoffa campaign?

(18) A. I, basically, did not allow the conversation (19) to go much past the, "Hey, how you doing. How about (20) supporting," and I would end it by saying, "Thanks for (21) asking, but I'm not

**KAUFFMAN vs. TEAMSTERS, AFL-CIO**                    **NOV 16, 2004 DEPO OF: W. KAUFFMAN**

involved," and then I'd walk away.

(22) So no; they never got to any specific dollar

Page 46

(1)  amount request.

(2)  Q. So if I understand you, they came to you, they (3) said, "Hey, will you support Jim Hoffa for president,"

(4)  and you said, "I'm not involved," and you walked away; (5) is that accurate?

(6)  A. Yes. I have a right to do that, yes.

(7)  Q. Did that happen in both instances?

(8)  A. Basically every time I was approached, yes.

(9)  Q. Were you other instances in which you were (10) approached about supporting the Hoffa campaign?

(11) A. I can't think of any right at this moment, no.

(12) Q. Were you approached by anyone employed by the (13) IBT and asked to support the campaign of someone other (14) Jim Hoffa or Ron Carey?

(15) A. I don't recall. I know there were a number of (16) different people that were politically involved, but I (17) don't recall specifically.

(18) Q. Other than what we've discussed so far today, (19) do you recall any other instances where you were asked (20) to support Ron Carey?

(21) A. Over a period of time as I fielded calls from (22) members, some of them would try to get me to endorse a

Page 47

(1)  particular person over the telephone and I, basically, (2) ended the conversation the same way, that I'm not (3) involved.

(4)  My job is not to campaign, but to deal with

(5)  the UPS contract.

(6)  Q. Anything else that you can recall?

(7)  A. No. That's pretty much it, I think.

(8)  Q. With regard to the local union official from (9) Oklahoma, when did your conversation with him occur?

(10) A. It had to have been at southern region panel, (11) but I don't know — I can't give you any specific date.

(12) Q. Can you give me an approximate year?

(13) A. At some point in 1997 prior to my removal.

(14) Q. How about the conversation with the local (15) union official from Texas?

(16) A. It would probably be around the same time, (17) same period of time.

(18) Q. And your conversation with Mr. Belk, when did (19) that occur?

(20) A. I'm not sure. I know it was after the '96 (21) election.

(22) Q. Would you say '96 or '97 then?

Page 48

(1)  A. I'm not sure.

(2)  Q. How about your conversation with Ms. Callahan (3) regarding the Carey campaign, when did that occur?

(4)  A. That was in '96. I believe early '96.

(5)  Q. And you referenced members calling and asking (6) you to support one candidate or the other.

(7)  A. Yes.

(8)  Q. When did those phone calls occur or was it (9) ongoing?

(10) A. It was, to some extent, ongoing from '96 on.

(11) Q. Can you think here today of anything else that (12) you consider to be improper election conduct?

(13) A. I guess one issue is the fact that when (14) individuals attempt to campaign or solicit for any (15) particular campaign during working hours, I thought it (16) was in violation of the rules.

(17) Q. Anything else?

(18) A. Second, in 1996, a number of individuals came (19) out of UPS on leave of absence for assignments at the (20) direction of the IBT and, because of the manner in which (21) those leaves were approved, I believed it to be (22) improper.

Page 49

(1)  Q. Anything else that you can recall in terms of (2) people soliciting your support for a candidate for (3) office?

(4)  A. That's all I can think of at the moment.

(5) Q. While you were employed by the IBT, you were a (6) participant in the IBT family pension plan; is that (7) correct?

(8) A. I believe I became a participant after the (9) first year.

(10) Q. So that would have been?

(11) A. I think '93 or '94.

(12) Q. Okay. Did you vest in that plan?

(13) A. Yes, I did.

(14) Q. Did the IBT make contributions to that plan on (15) your behalf?

(16) A. I believe they did, yes.

(17) Q. Are you alleging any wrongdoing on behalf of (18) the IBT with respect to that IBT family plan?

(19) A. I believe the IBT was responsible for ensuring (20) that I continue getting credit for my 177 plan.

(21) Q. Okay. I understand that and we'll get to (22) that.

**Page 50**

(1) But I just want to confirm that you're not (2) alleging any failure of the IBT to make contributions to (3) the IBT family plan.

(4) A. I'm not aware of any failure to make (5) contributions.

(6) Q. When you were terminated from the IBT, did you (7) -- what happened to the money in the IBT plan, did you (8) roll it over?

(9) A. I rolled it over because I was forced to live (10) off of it.

(11) Q. Any allegation that you didn't receive the (12) full amount of money that you were entitled to from the (13) IBT family plan?

(14) A. I need to clarify that. To the extent that (15) the money that I received -- I don't know if I can (16) really answer that.

(17) Q. Okay. I'm just trying to -- I just want to (18) make sure, I just want to clarify that you don't have (19) any allegations of wrongdoing with respect to the IBT (20) family plan.

(21) I understand that you have other claims with (22) respect to the Local 177 plan, and we'll get to that.

**Page 51**

(1) But I just want to confirm that you don't have any (2) allegations with respect to the

IBT family plan.

(3) A. I've not made any at this point. But I don't (4) know whether or not there's any, I don't know, (5) responsibility in trying to resolve this 177 dispute or (6) not. I don't know.

(7) Q. But at least so far as we've gotten --

(8) A. Up to date, I have not forwarded any, you (9) know, formal complaint against the family plan. That's (10) the best I can answer that.

(11) Q. You stated that you lived off of the money (12) that was rolled over from the IBT family plan. How long (13) did you use that money?

(14) A. Until it ran out. It was 2001 before I got a (15) full-time job.

(16) Q. Were you covered by a health and welfare plan (17) while you were employed by the IBT?

(18) A. Yes.

(19) Q. Any allegations of wrongdoing by the IBT with (20) respect to that health and welfare plan?

(21) A. I think the only thing that I'm aware of at (22) this point is that I never received COBRA upon my

**Page 52**

(1) termination.

(2) Q. Did you receive any communication from the IBT (3) regarding COBRA rights?

(4) A. No, I did not.

(5) Q. Did you inquire about possible COBRA rights?

(6) A. I did not inquire. I think I was somewhat (7) distraught at that point.

(8) (Kauffman Deposition Exhibit (9) Number 5 was marked for (10) identification.)

(11) BY MS. MCDONOUGH:

(12) Q. Mr. Kauffman, I've placed before you what's (13) been marked as Exhibit 5. If you'll just take a minute (14) to review that.

(15) A. (Perusing document.)

(16) Q. And if you'll turn to the last page of Exhibit (17) 5, is that your signature?

(18) A. Yes, it is.

(19) Q. And is this a letter that you sent to Mary Ann (20) Tweedle and Wayne Fernicola?

Case 1:01-cv-01104-RBW  Document 69-4  Filed 12/17/04  Page 16 of 29

**KAUFFMAN vs. TEAMSTERS, AFL-CIO**        **NOV 16, 2004 DEPO OF: W. KAUFFMAN**

(21) A. Yes.

(22) Q. And in this letter, basically you're claiming

**Page 53**

(1) that UPS was required to pay pension benefits to --

(2) pension contributions to the Local 177 UPS plan while (3) you're on leave of absence with the IBT?

(4) A. Yes.

(5) Q. What was your basis of your belief that UPS (6) was required to pay contributions while you were on a (7) leave of absence with the IBT?

(8) **A. The collective bargaining agreements and past (9) practice.**

(10) Q. What collective bargaining agreement are you (11) referring to?

(12) **A. Both the national and the supplemental (13) agreement — 177's supplemental agreement.**

(14) Q. So the UPS national master agreement and the (15) Local 177 supplement to that?

(16) A. Yes.

(17) Q. Why did you believe that the national master (18) and Local 177 supplement required UPS to pay (19) contributions while you were on a leave of absence?

(20) **A. Without having the contract language before (21) me, Article 34, I believe, in the national master (22) requires contributions to all benefit plans for all**

**Page 54**

(1) **bargaining unit employees.**

(2) And the 177 supplement requires that (3) individuals on leave of absence be treated the same as a (4) regular full-time employee.

(5) (Kauffman Deposition Exhibit (6) Number 6 was marked for (7) identification.)

(8) BY MS. MCDONOUGH:

(9) Q. Mr. Kauffman, I've placed before you Exhibit (10) 6. Please take a moment to review that and, (11) specifically, if you'd look at the second page.

(12) A. (Complying.) Uh-huh.

(13) Q. Is that your signature?

(14) A. Yes.

(15) Q. And is this a grievance that you filed with (16) Local 177?

(17) A. Yes, it is.

(18) Q. And is that on the same issue as your letter (19) of May 22nd, Exhibit 5?

(20) A. I believe it is, yes.

(21) (Kauffman Deposition Exhibit (22) Number 7 was marked for

**Page 55**

(1) identification.)

(2) BY MS. MCDONOUGH:

(3) Q. Mr. Kauffman, I've placed before you Exhibit (4) 7. Do you recognize this as a letter from Wayne (5) Fernicola?

(6) A. Yes.

(7) Q. Did you receive this letter?

(8) A. Yes, I did.

(9) Q. And in this letter, Mr. Fernicola indicates (10) that whether you're entitled to pension credit is a (11) matter solely within the discretion of the trustees of (12) the UPS pension plan. (13) Did you agree with Mr. Fernicola?

(14) A. No, I did not.

(15) Q. Why did you disagree with him?

(16) **A. Because it's a mandatory subject of collective (17) bargaining and the contract refers to it, and in the (18) past, grievances regarding pension have been filed by (19) Local 177.**

(20) Q. Mr. Fernicola informed you that your claim for (21) benefits would be referred to the trustees of the plan?

(22) **A. That's what he said in his letter, yes.**

**Page 56**

(1) Q. Do you have any knowledge of whether your (2) claim for benefits was addressed by the trustees of the (3) plan?

(4) **A. Only to the extent that they sent a letter (5) alleging that it was, but I was denied the opportunity (6) to be present to argue my point.**

(7) Q. Who did you make the request to be present at (8) the trustee meeting?

(9) **A. I believe the request was made to Mr.**

(10) Fernicola, who, in turn, encouraged the plan (11) administrator that he didn't believe that

Case 1:01-cv-01104-RBW    Document 69-4    Filed 12/17/04    Page 17 of 29

KAUFFMAN vs. TEAMSTERS, AFL-CIO                 NOV 16, 2004 DEPO OF: W. KAUFFMAN

I needed to be (12) present.

(13) Q. Was anyone at the IBT aware that you were (14) pursuing a grievance with Local 177 on this pension (15) issue?

(16) A. Yes.

(17) Q. Who was aware?

(18) A. Mr. Hall was aware; and I don't know for sure, (19) but possibly Ms. Callahan may have been aware, as well.

(20) Q. How did Mr. Hall become aware?

(21) A. I believe I had a brief conversation with him, (22) and Mr. Fernicola came to Washington with his attorney.

**Page 57**

(1) Q. What did Mr. Hall say during that (2) conversation?

(3) A. He didn't say a lot. He just asked me what (4) the dispute was. I told him what it was.

(5) Q. Any other comments that you recall from Mr.

(6) Hall?

(7) A. Not that I can recall.

(8) Q. When did that conversation with Mr. Hall (9) occur?

(10) A. It was probably May or June of 1998.

(11) (Off the record.)

(12) (Whereupon, a brief recess was taken.)

(13) (Kauffman Deposition Exhibit (14) Number 8 was marked for (15) identification.)

(16) BY MS. MCDONOUGH:

(17) Q. Mr. Kauffman, I have placed before you Exhibit (18) 8 --

(19) A. Yes.

(20) Q. -- which is a letter to you from a law firm, (21) Zazzali, Zazzali, Fagella & Nowak.

(22) A. Uh-huh.

**Page 58**

(1) Q. Did you receive this letter?

(2) A. Yes, I did.

(3) Q. And this law firm that directed this letter to (4) you is the outside counsel for the Local 177 UPS plan; (5) is that correct?

(6) A. Based on their letter, they're co-counsel.

(7) Q. That's fine. And this letter is informing you (8) that the trust has denied your claim for

benefits; is (9) that correct?

(10) A. In that -- well, that's what the letter says.

(11) Q. What did you do after you received this (12) letter?

(13) A. I believe I served notice on the GEB and Mr.

(14) Sever that the matter was still unresolved and asked for (15) their intervention.

(16) Q. The International Union General Executive (17) Board?

(18) A. Yes.

(19) Q. Are you aware of whether the IBT is a trustee (20) for the Local 177 UPS pension plan?

(21) MR. THOMPSON: Objection: calls for a legal (22) conclusion.

**Page 59**

(1) THE WITNESS: I'm not aware.

(2) BY MS. MCDONOUGH:

(3) Q. So you don't know?

(4) A. I don't know for sure.

(5) Q. Do you know if the IBT is a sponsor of the (6) Local 177 UPS plan?

(7) A. I believe the sponsor is United Parcel (8) Service.

(9) (Kauffman Deposition Exhibit (10) Number 9 was marked for (11) identification.)

(12) BY MS. MCDONOUGH:

(13) Q. Mr. Kauffman, I've placed before you what has (14) been marked as Exhibit 9. Do you recognize this (15) document?

(16) A. (Perusing document.) Yes.

(17) Q. And is that your signature on the second page?

(18) A. Yes.

(19) Q. And this is the letter that you sent to the (20) IBT --

(21) A. Yes, it is.

(22) Q. -- regarding your pension issue?

**Page 60**

(1) A. Uh-huh.

(2) Q. What relief were you seeking from the IBT?

(3) A. Well, based on my understanding, I was (4) expecting the IBT to direct Mr. Fernicola or the local (5) to process the

Case 1:01-cv-01104-RBW   Document 69-4   Filed 12/17/04   Page 18 of 29

KAUFFMAN vs. TEAMSTERS, AFL-CIO                    NOV 16, 2004 DEPO OF: W. KAUFFMAN

grievance consistent with the grievance (6) procedure, number one; and number two, I expected the (7) International to investigate the plan.

(8) Q. Do you have any knowledge of whether the IBT (9) has any legal authority over the Local 177 UPS plan?

(10) A. As a member, I believe the international union (11) has an authority over the local union.

(12) Q. I was asking about the Local 177 UPS plan.

(13) A. I believe that they would have some authority (14) based on the contract language.

(15) Q. And you're referring to the national master (16) and the Local 177 supplement?

(17) A. Yes; because both documents were approved by (18) the national.

(19) Q. Did you get any response from the IBT to your (20) letter?

(21) A. No, I did not.

(22) Q. Did anyone from the IBT speak to you about

Page 61

(1) your letter?

(2) A. No, they did not.

(3) Q. What, if any, further action did you take (4) after you sent this letter to the General Executive (5) Board?

(6) A. Realizing that the then acting general (7) president was concluding his term, I then communicated (8) it to a sitting vice president that I knew would be (9) involved with the new administration coming in.

(10) Q. Who is that vice president?

(11) A. Vice President Phil Young.

(12) Q. Was he part of the Carey administration?

(13) A. He was elected in 1996.

(14) Q. How did you contact Mr. Young?

(15) A. I faxed this document to his office in Kansas.

(16) Q. Did you receive any response from Mr. Young?

(17) A. I had a brief conversation with him when he (18) was in Washington.

(19) Q. When did that conversation occur?

(20) A. At some point after I had faxed it. I'm (21) guessing maybe a week/ten days.

(22) Q. When did you fax it?

Page 62

(1) A. Beginning of March.

(2) Q. Of '99?

(3) A. Yes.

(4) Q. Okay.  What did Mr. Young say to you?

(5) A. He basically acknowledged that there were some (6) unfinished matters from the previous administration (7) without specifically mentioning my issues.

(8) Q. Do you recall anything else that he said?

(9) A. That's all that I can recall at this time.

(10) Q. Did you take any action on this pension issue (11) after you spoke with Mr. Young?

(12) A. I think that was it.  I was basically waiting (13) to give the new administration an opportunity to (14) respond.

(15) Q. Can you recall any other conversations with (16) anyone from the IBT about this pension issue?

(17) A. Early on, I had a brief conversation with Mr. (18) Belk and he led me to believe that there would be -- for (19) lack of a better term, some corrections were in line (20) with the family plan that would take care of that issue.

(21) And I also had a conversation with Mr. (22) Perrucci just before he left, and we never completed

Page 63

(1) that conversation to get this resolved.

(2) Q. When did the conversation with Mr. Belk occur?

(3) A. I believe that was late '94.

(4) Q. And Mr. Belk indicated that there would be (5) some amendment to the IBT family plan?

(6) A. I don't think he used the word "amendment," (7) but that it would be addressed through the family plan (8) or when they corrected the family, or whatever it was (9) that was going on.

Case 1:01-cv-01104-RBW   Document 69-4   Filed 12/17/04   Page 19 of 29

KAUFFMAN vs. TEAMSTERS, AFL-CIO          NOV 16, 2004 DEPO OF: W. KAUFFMAN

(10) Q. When did your conversation with Mr. Perrucci (11) occur?

(12) A. It wasn't too long after that, maybe a couple (13) of months.

(14) Q. So in '94?

(15) A. Late '94/early '95.

(16) Q. And what did Mr. Perrucci say?

(17) A. We never really finished discussing the matter (18) because that was when he had some other issues going on (19) and then he left. So I never had a chance to finish (20) discussing with him the remedy to try to correct it.

(21) Q. Any other conversations that you recall with (22) anyone on the IBT regarding your claim for pension

Page 64

(1) benefits?

(2) A. I may have had a brief conversation with Mr.

(3) Sever, but it didn't amount to much, whatever it was.

(4) Q. What time period was that?

(5) A. It may have been around '97, maybe '98.

(6) Q. When did Mr. Hoffa's inauguration occur?

(7) A. At some point mid-March, I believe.

(8) Q. Of '99?

(9) A. Yes. Sorry.

(10) Q. And you were terminated?

(11) A. March 30th or 31st. I think it was the 31st.

(12) Q. Who notified you of your termination?

(13) A. A gentleman by the name of Dane Passo.

(14) Q. Would you spell his last name?

(15) A. P-a-s-s-o.

(16) Q. Who is Mr. Passo?

(17) A. I believe he was an assistant to the general (18) president at that time.

(19) Q. So he was an assistant to Mr. Hoffa?

(20) A. Yes.

(21) Q. What did Mr. Hoffa -- I'm sorry. What did Mr.

(22) Passo say to you when he came to terminate your

Page 65

(1) employment?

(2) A. He came in the office, had some papers in his (3) hands, handed them to me and said, "Here you go."

(4) Q. What did you say?

(5) A. I read it and I looked at him and I don't (6) think I even responded. Security was there with a (7) couple of empty boxes for me to empty out my desk.

(8) Q. Any other comments from Mr. Passo?

(9) A. Not that I can recall.

(10) Q. Did he mention your race?

(11) A. No. There was no conversation between us.

(12) Q. No discussion of election activity?

(13) A. There was no discussion at all.

(14) Q. Any conversations with anyone else at the IBT (15) about your termination?

(16) A. At that time?

(17) Q. At that time.

(18) A. No; other than as I was leaving the office, (19) Trish Callahan came down, shook my hand and said, "Good (20) luck."

(21) Q. Any communications with the IBT after you were (22) terminated?

Page 66

(1) A. Other than to get my pension, no.

(2) Q. Were you still a member of Local 177 when you (3) were terminated by the IBT?

(4) A. As far as I knew, I was, yes.

(5) Q. Did you attempt to go back to UPS?

(6) A. Yes, I did.

(7) Q. What happened?

(8) A. I was denied to return to work.

(9) Q. What was the basis for that?

(10) A. They alleged that I could not do the job as (11) package driver because of my impairment.

(12) Q. Is that a physical impairment?

(13) A. Yes, it is.

(14) Q. Were you paying dues to Local 177 at this (15) point?

(16) A. I continued to pay my dues despite their (17) attempt to send them back to me.

(18) Q. How long did you continue to send checks --

(19) dues checks to Local 177?

Case 1:01-cv-01104-RBW   Document 69-4   Filed 12/17/04   Page 20 of 29

KAUFFMAN vs. TEAMSTERS, AFL-CIO       NOV 16, 2004 DEPO OF: W. KAUFFMAN

(20) A. Probably all the way into 2000.
(21) Q. What was Local 177's reason for returning your (22) checks?

**Page 67**

(1) A. Initially, they claimed that there was a dues (2) increase of one dollar. So rather than call and tell me (3) to send in the extra dollar, they sent the entire check (4) back claiming that they couldn't accept it.
(5) Q. Did you send them an additional check for --
(6) A. I replaced the check on one or two occasions (7) and then I physically drove from here to Hillside (8) because they kept refusing my dues.
(9) Q. And were you eventually issued a withdrawal (10) card from Local 177?
(11) A. 177 did send me a withdrawal card. I did not (12) request it. It was involuntary.
(13) Q. Other than the one dollar increase with the (14) dues, did they indicate any other reason why they were (15) not accepting your check?
(16) A. Not that I can recall.
(17) Q. Mr. Kauffman, you've identified William Hill (18) as a witness.
(19) A. Yes.
(20) Q. What knowledge does Mr. Hill have of the (21) allegations in the complaint?
(22) A. Mr. Hill has been a close personal friend

**Page 68**

(1) **since about 1981. He was the one that recommended me** (2) **for this position of international representative.**
(3) He's been a business agent and trustee of (4) Local 177 for quite a number of years and been a -- I (5) guess assistant trustee or business agent at a couple of (6) other local unions.
(7) He and I have had ongoing dialogue over the (8) years about my job and my job responsibilities and (9) basically been my mentor.
(10) Q. Other than what you've told him about your (11) employment with the IBT, does he

have any independent (12) knowledge of your claims against the IBT?
(13) A. Can you be a little more specific?
(14) Q. I just want to know if his knowledge of the (15) allegations in the complaint is based on his (16) conversations with you. That's all.
(17) A. Yeah; it's based on his conversations with me (18) and his knowledge of the 177 agreement and possibly (19) discussions that he may have had with Mr. Perrucci.
(20) Q. You've also listed Mr. Burke -- John Burke as (21) a witness. Mr. Burke is an accountant?
(22) A. Yes, he is.

**Page 69**

(1) Q. Has he performed any calculations of damages (2) for you in this lawsuit?
(3) A. I believe he has, and we've gone over some (4) aspects of that a couple of times. I've forwarded (5) information to him.
(6) MS. MCDONOUGH: We have not received any (7) damages calculations from Mr. Burke, so we'd just like (8) to formally request them.
(9) MR. THOMPSON: (Nodding head.)
(10) (Off the record.)
(11) BY MS. MCDONOUGH:
(12) Q. Mr. Kauffman, were other employees terminated (13) at the same time that you were terminated?
(14) A. I don't know. I -- to be honest, I don't (15) know.
(16) Q. If you would turn to Exhibit 4 and (17) interrogatory number 7 -- or not Exhibit 4, I'm sorry, (18) Exhibit 3 and page 9.
(19) A. (Complying.)
(20) Q. There you list your employment since the IBT.
(21) A. Uh-huh.
(22) Q. And first, you were a temporary employee with

**Page 70**

(1) Careers & Company. Is that the first position you had?
(2) A. Yes.

Case 1:01-cv-01104-RBW   Document 69-4   Filed 12/17/04   Page 21 of 29

KAUFFMAN vs. TEAMSTERS, AFL-CIO                    NOV 16, 2004 DEPO OF: W. KAUFFMAN

(3) Q. What did that involve?

(4) A. Just being assigned sometimes on a daily basis (5) to various companies and/or law firms doing support (6) work.

(7) Q. Did you have -- I'm sorry. Did you have any (8) retirement benefits associated with that position?

(9) A. What do you mean?

(10) Q. 401(k), anything like that.

(11) A. No.

(12) Q. What was your salary?

(13) A. Ball park, somewhere between $9 and $10 an (14) hour. It was an hourly.

(15) Q. And then you worked for the Security (16) Management Corporation?

(17) A. Yes.

(18) Q. What did your duties involve there?

(19) A. I was basically like a prep person. After (20) people moved out of apartments, I'd go and clean, take (21) down the blinds, anything on walls, patch the walls.

(22) Sometimes I'd have to patch sheetrock.

---

Page 71

(1) Q. Any retirement benefits associated with that (2) position?

(3) A. Not that I'm aware of.

(4) Q. Was that hourly?

(5) A. Yes; that was hourly, as well.

(6) Q. What was, approximately, your hourly wage?

(7) A. I think it was somewhere around $11/$11.50 an (8) hour.

(9) Q. And for what period of time did you hold that (10) job?

(11) A. I think that lasted maybe about two/two-and-a- (12) half months.

(13) Q. And when was that?

(14) A. That would be in 2001.

(15) Q. And how long was your position was Careers & (16) Company?

(17) A. I don't remember off the top of my head. I (18) think I — maybe six months.

(19) Q. Okay. Was that in 2001?

(20) A. Yes, I believe it was.

(21) Q. And you were an assistant supervisor of (22) maintenance with the Metropolitan Maintenance Company?

---

Page 72

(1) A. Yes. That was done consistent with the (2) Security Management for about a month/month and a half.

(3) It was an evening job.

(4) Q. Any retirement benefits associated with that?

(5) A. Not that I'm aware of.

(6) Q. What was your hourly rate?

(7) A. I don't know.

(8) Q. Okay. And then you became an independent EEOC (9) investigator?

(10) A. Yes.

(11) Q. How long did you stay in that position?

(12) A. A couple of months.

(13) (Off the record.)

(14) (Thereupon, A. Richard Obester, court (15) reporter replaced Wanda L. Granger, court (16) reporter and the deposition continued as (17) follows.)

(18) BY MS. McDONOUGH: (resumed)

(19) Q. Mr. Kauffman, before the break I think we (20) were talking about your position as an independent EEO (21) investigator?

(22) A. Yes.

---

Page 73

(1) Q. You indicated that the position lasted a (2) couple of months?

(3) A. Yes.

(4) Q. What were your duties with that position?

(5) A. Basically I would get a case referred to (6) me, you know, to investigate, interview the parties, and (7) write a report on it.

(8) Q. Any retirement benefits associated with (9) that position?

(10) A. No.

(11) Q. What was your salary?

(12) A. It was independent. It was per case, (13) somewhere between $800.00 to $1000.00 per case. I might (14) have done four or five cases.

(15) Q. Then we get to your final position as a (16) staff representative with the CWA, Communication Workers (17) of America?

(18) A. Yes.

(19) Q. Do you still have that position?

(20) A. Yes, I do.

(21) Q. When did you enter into that position?

(22) A. November of 2001.

**Page 74**

(1) Q. What is your official title?

(2) A. Staff representative. It is the (3) equivalent of a business agent with the Teamsters Local (4) Union.

(5) Q. What is your salary?

(6) A. I believe my annual is about $52,000 or (7) $53,000.

(8) Q. I assume there are retirement benefits (9) with this position?

(10) A. Yes.

(11) Q. What are your retirement benefits?  Do (12) you have a 401K?

(13) A. It is not a 401K.  It is just a straight (14) pension.

(15) Q. So they make pension contributions?

(16) A. Yes.

(17) MS. McDONOUGH:     I believe in the (18) interrogatories or rather the document request, we (19) requested Mr. Kauffman's W-2 and other tax related (20) documents.  So if you could just confirm that we are (21) going to get those.  I had some conversation with Mr. (22) Johnson --

**Page 75**

(1) MR. THOMPSON: We will supply (2) everything that you are entitled to.

(3) MS. McDONOUGH:     My understanding (4) from Mr. Johnson was that those would be provided today.

(5) THE WITNESS:  I did not know I was (6) supposed to bring them.

(7) MS. McDONOUGH:     We need them (8) soon because we have the deposition of Mr. Burke.

(9) MR. THOMPSON: When was it (10) scheduled?

(11) MS. McDONOUGH:     We haven't (12) scheduled it.

(13) MR. THOMPSON: I haven't been in the (14) loop and I don't want to make a representation that is (15) inconsistent with what Mr. Johnson has said.  I (16) understand that we have them

and I will get you the (17) documents.

(18) MS. McDONOUGH:     We want to do (19) his deposition before the Thanksgiving holiday.  With (20) that I think we will conclude the deposition.

(21) (Thereupon, at approximately 1:13 o'clock, p.m., (22) the taking of the deposition was concluded.)

**Page 76**

(1) CERTIFICATE OF NOTARY PUBLIC (2) I, Wanda L. Granger, the officer before whom (3) the foregoing deposition pages 4 through 72 was taken, (4) do hereby certify that the witness whose testimony (5) appears in the foregoing deposition was duly sworn by (6) me; that the testimony of said witness was taken by me (7) stenographically and that I thereafter reduced it to (8) typewriting; that said deposition is a true record of (9) the testimony given by said witness; that I am neither (10) counsel for, related to, nor employed by any of the (11) parties to the action in which this deposition was (12) taken; and further, that I am not a relative or employee (13) of any attorney or counsel employed by the parties (14) thereto; nor financially or otherwise interested in the (15) outcome of the action.

(17) _____ (18)

WANDA L. GRANGER, CVR, CCR (19) Notary Public in and for the (20) District of Columbia (21) My commission expires: (22) October 14, 2005

**Page 77**

(1) CERTIFICATE OF COURT REPORTER (3) I, A. RICHARD OBESTER, a court reporter in and (4) for the District of Columbia, before whom the foregoing (5) deposition pages 72 through 75 was taken, by me in (6) shorthand at the time and place mentioned in the caption (7) hereof and thereafter transcribed by me; that said (8) deposition is a true record of the testimony given by (9) said witness; that I am neither counsel for, related to, (10) nor employed by any of the parties to the action in (11) which this testimony is taken; and further, that I am (12) not a relative of or employee of any attorney or counsel (13) employed by the

parties hereto, nor financially or (14) otherwise
interested in the outcome of this action.

Case 1:01-cv-01104-RBW   Document 69-4   Filed 12/17/04   Page 24 of 29

**KAUFFMAN vs. TEAMSTERS, AFL-CIO**   **NOV 16, 2004 DEPO OF: W. KAUFFMAN**

**$**

$1,000 41:21; 42:7
$10 70:13
$1000.00 73:13
$11/$11.50 71:7
$5,000 26:18,20
$52,000 74:6
$53,000 74:7
$82,5- 25:21
$800 9:9
$800.00 73:13
$9 70:13
$950 9:9

**'**

'92 12:6
'93 8:8,10,14; 14:11; 49:11
'93-to-'97 12:22
'94 9:16,18; 10:4; 49:11; 63:3,14
'94/early 63:15
'95 10:16; 11:1; 25:2; 63:15
'96 25:2; 47:20,22; 48:4,4,10
'97 24:11; 47:22; 64:5
'97/early 21:5
'98 10:9; 21:5; 26:16; 64:5
'99 41:5,6; 62:2; 64:8

**1**

1 15:12,16; 16:2
11 35:1
177 7:11,15,18; 26:8; 28:5; 49:20; 50:22; 51:5; 53:2,15,18; 54:2,16; 55:19; 56:14; 58:4,20; 59:6; 60:9,12,16; 66:2,14,19; 67:10,11; 68:4,18
177's 53:13; 66:21
1977 6:19
1981 68:1
1992 7:3
1993 24:10
1994 14:16
1995 39:21
1996 48:18; 61:13
1997 17:19; 47:13
1998 57:10

**2**

2 17:8,11; 27:10,17
2000 66:20
2001 51:14; 71:14,19; 73:22
22nd 54:19

**3**

3 27:5,8; 69:18
30th 64:11
31st 64:11,11
34 53:21
35 29:8

**4**

4 27:11; 28:18,21,22; 41:11; 69:16,17
401(k 14:13
401(k) 70:10
401K 74:12,13

**5**

5 52:9,13,17; 54:19

**51** 41:17
**57** 30:21

**6**

6 54:6,10
65 35:3,16
651 15:4; 17:20
652 15:4

**7**

7 29:7; 54:22; 55:4; 69:17
74 34:22; 35:2; 36:8; 37:3

**8**

8 57:14,18
89 15:4

**9**

9 30:18; 59:10,14; 69:18

**A**

Aaron 42:19
ability 5:15,17; 19:22
absence 28:4,6; 48:19; 53:3,7,19; 54:3
accept 67:4
accepting 67:15
accommodation 18:15,16
accountant 68:21
accurate 46:5
acknowledged 62:5
acting 61:6
action 61:3; 62:10
activities 44:8
activity 65:12
Actually 33:22
ADA 18:12; 19:3,17,21
ADA-related 18:7
additional 18:21; 19:16,20; 20:1,11,18; 67:5
address 42:17; 43:7
addressed 56:2; 63:7
administration 44:6; 61:9,12; 62:6,13
administrative 29:15; 40:9
administrator 56:11
admissible 16:19
African- 31:17
Again 24:6; 31:9; 34:16; 37:19; 42:20; 44:15; 45:5
against 4:10; 51:9; 68:12
agent 36:22; 68:3,5; 74:3
agents 38:9,17
agree 55:13
agreed-upon 28:9
agreement 53:10,13,13,14; 68:18
agreements 53:8
Air 13:20; 14:1,8
allegation 50:11
allegations 38:15; 50:19; 51:2,19; 67:21; 68:15
allege 41:20
alleged 66:10
allegedly 32:8,16
alleging 49:17; 50:2; 56:5
allow 34:5; 45:18
allowance 9:2; 26:1,2,6; 31:4
allowances 26:12
Along 14:21
amended 28:22; 30:18; 41:10,18

amendment 63:5
amendment, 63:6
America 73:5
American 31:18; 33:12
Americans 38:21; 39:5
amount 8:20; 9:6; 12:11; 34:10; 43:10; 46:1; 50:12; 64:3
and/or 70:5
Ann 52:19
annual 74:6
answers 5:8; 27:9
anyone 11:14; 23:15,19; 25:9,13; 28:5,14; 42:11; 43:18; 46:12; 56:13; 60:22; 62:16; 63:22; 65:14
anything 25:19; 36:1,5; 37:12; 39:12; 43:7,10; 47:6; 48:11,17; 49:1; 62:8; 70:10,21
anytime 10:11; 32:1; 40:18
apartment 8:13,17,22; 9:3,10,14; 10:17,18
apartments 70:20
appear 43:8
appeared 43:4
appearing 4:3
appears 16:11
applied 41:13,16
approach 42:7,11
approached 43:2; 44:13,16,19; 45:9; 46:8,10,12
appropriate 22:21
approved 48:21; 60:17
approximate 9:8; 47:12
approximately 71:6
area 24:1; 25:4,10
argue 56:6
around 41:2; 47:16; 64:5; 71:7
Article 53:21
articles 41:2
Asian 38:20; 39:5
aspects 69:4
assigned 70:4
assignments 16:1; 48:19
assistant 29:15; 40:20,22; 41:8; 64:17,19; 68:5; 71:21
associated 70:8; 71:1; 72:4; 73:8
assume 74:8
attempt 48:14; 66:5,17
attention 17:18
attorney 4:17; 35:5,11; 56:22
authority 29:17; 38:3; 60:9,11,13
avoid 5:8
aware 5:18; 45:3; 50:4; 51:21; 56:13,17,19,20; 58:19; 59:1; 71:3; 72:5
aware; 56:18
away 22:2; 35:14; 45:21
away; 46:4

**B**

back 15:21; 19:16,22; 20:10,17; 29:2; 35:1; 41:10; 66:5,17; 67:4
Bales-Henry 42:15
Ball 70:13
bargaining 53:8,10; 54:1; 55:17
Base 25:21; 26:4
Based 21:4; 58:6; 60:3,14; 68:15,17
basic 42:9
Basically 8:20; 12:6; 14:1;

36:15; 43:14,22; 45:18; 46:8; 47:1; 52:22; 62:5,12; 68:9; 70:19; 73:5
basis 21:13; 53:5; 66:9; 70:4
bathroom 34:2,3
became 49:8; 72:8
become 56:20
began 8:2; 12:6; 39:14
beginning 65:20; 62:1
behalf 49:15,17
belief 53:5
believed 21:14; 44:4; 48:21
Belk 42:20; 43:16,19,21; 47:18; 62:18; 63:2,4
bell 17:6
benefit 27:3; 53:22
benefits 53:1; 55:21; 56:2; 64:1; 70:8; 71:1; 72:4; 73:8; 74:8,11
benefits; 58:8
besides 43:19
best 20:12; 33:7; 51:10
better 40:3; 62:19
Beyond 38:15
bit 35:2
black 32:13,17,17; 33:12
blinds 70:21
Board 58:17; 61:5
Borders 17:20; 18:13; 20:10,17
Borders' 18:2,19; 19:5
Borders; 20:14
boxes 65:7
Brad 17:20
break 33:19,21; 34:5,19; 72:19
brief 34:20; 56:21; 57:12; 61:17; 62:17; 64:2
bring 75:6
Brotherhood 6:21
Burke 68:20,20,21; 69:7; 75:8
business 36:22; 68:3,5; 74:3

**C**

calculations 69:1,7
call 67:2
Callahan 23:5,12,16,19; 30:22; 31:2,3,5,20; 32:1,11,14; 33:1,8,15; 34:7,15; 35:4,11,14,19,21; 38:3; 40:3; 42:3; 48:2; 56:19; 65:19
called 6:6; 42:20; 43:16
calling 43:22; 48:5
calls 46:21; 48:6; 58:21
camel 38:20
campaign 41:22; 42:12,18; 43:3,7,9,12; 44:1,13,10; 45:17; 46:10,13; 47:4; 48:3,14,15
campaigns 45:15
can't 19:6; 25:19; 34:8; 46:11; 47:11
candidate 48:6; 49:2
Candler 24:19
Candler's 24:21
card 42:16; 43:3,6,8,13,14; 67:10,11
care 62:19
Careers 70:1; 71:15
Carey 41:22; 42:12,17; 43:3,7,9,12; 44:5,10,12; 46:14,20; 48:3; 61:12
Carey's 44:3
case 4:10; 16:6,7,10,11,22; 17:4,5,19,21; 18:1,3,8,12,21; 20:21; 73:5,12,13
case; 4:11

Case 1:01-cv-01104-RBW   Document 69-4   Filed 12/17/04   Page 25 of 29

KAUFFMAN vs. TEAMSTERS, AFL-CIO                 NOV 16, 2004 DEPO OF: W. KAUFFMAN

cases 16:2; 18:5; 73:14
caucasian 37:15
caucasians 37:20
central 21:17
certainly 29:16
chairman 15:9
chance 63:19
change 40:18
check 67:3,5,6,15
checks 66:18,19,22
claim 18:22; 19:1,3,17,21;
55:20; 56:2; 58:8; 63:22
claimed 67:1
claiming 20:19; 52:22; 67:4
claims 50:21; 68:12
clarify 50:14,18
clarify; 25:11
clean 70:20
clear 13:7; 38:11
clearly 37:14
close 67:22
closed 10:9
co-chair 14:17; 16:3; 20:14;
23:8
co-counsel 58:6
COBRA 51:22; 52:3,5
collective 53:8,10; 55:16
color 31:12,16
Columbia 8:11
coming 11:8; 18:11; 61:9
comment 21:9; 29:21; 30:2;
31:2; 32:16; 38:22;
39:1,4,5,7,8
comments 29:10,19,20;
30:4,22; 32:4,7; 36:10,14,17;
37:1; 38:8,13; 57:5; 65:8
committee 13:3; 14:8
communicated 22:13; 38:4;
42:2,4; 61:7
communicating 24:6
communication 52:2; 73:16
communications 65:21
commuted 8:5
companies 70:5
Company 70:1; 71:16,22
compensation 26:5; 29:22;
31:8; 36:18; 37:10
complaint 19:14; 28:22;
30:19; 35:1; 38:16; 41:11,18;
51:9; 67:21; 68:15
completed 62:22
completely 6:1
Complying 29:4; 36:9;
41:19; 54:12; 69:19
component 40:18
concerning 22:15; 25:9
conclude 75:20
concluding 61:7
conclusion 58:22
condition 5:16; 11:5
conditions 27:19
conduct 48:12
conference 21:18
confidante 40:4
confirm 50:1; 51:1; 74:20
confused 19:8
consider 38:8; 48:12
considering 34:10
consistent 60:5; 72:1
constructive 35:20,22
consultation 17:17
contact 41:3; 61:14
contend 27:14
context 30:2; 35:7; 37:2
continue 12:8; 49:20; 66:18
continued 66:16; 72:16
contract 12:18,21,22; 13:5;
47:5; 53:20; 55:17; 60:14
contribute 44:10

contributions 44:1; 49:14;
50:2,5; 53:2,6,19,22; 74:15
controlled 27:14,19
conversation 22:17,19;
33:18; 35:4,7,9,15; 36:2,6;
37:3; 41:2; 45:18;
47:2,9,14,18; 48:2; 56:21;
57:2,8; 61:17,19; 62:17,21;
63:1,2,10; 64:2; 65:11; 74:21
conversations 22:5,14;
23:18; 25:8,13; 28:14; 62:15;
63:21; 65:14; 68:16,17
cook 38:19; 39:1
cookies 38:21
cookies. 38:21
Corporation 70:16
corrected 63:8
corrections 62:19
cost 45:15
cost-effective 8:21
costs 9:1
couldn't 35:13; 67:4
count 18:11
counterpart 20:6,9,13
country 41:3
couple 41:9; 63:12; 65:7;
68:5; 69:4; 72:12; 73:2
course 26:10
covered 51:16
created 40:20
creation 40:21; 41:7
credit 49:20; 55:10
Cristy 35:5; 36:3
current 6:12
CWA 73:16

D

daily 70:4
damages 69:1,7
Dane 64:13
date 7:20; 10:15; 28:3,9;
47:11; 51:8
day 34:1
days 61:21
deal 47:4
debt 44:1
decision 13:15; 19:14,19;
20:5
decisions 13:4,9,12; 24:7
Defendant's 27:9
define 8:12; 31:13
degree 35:12
denied 18:22; 19:2,3,10,15;
56:5; 58:8; 66:8
deny 18:19
depositions 4:9,14
desk 32:20; 35:17; 65:7
despite 66:16
dialogue 68:7
different 24:20; 46:16
direct 5:22; 60:4
directed 58:3
direction 48:20
directly 33:2; 38:14
director 40:16,20,22; 41:8
disagree 55:15
discharge 66:6,7,9,22; 35:22
discharge; 35:20
discovery 16:19
discretion 55:11
discussed 11:13; 25:18;
37:8,11; 46:18
discussing 63:17,20
discussion 11:7; 22:6; 33:9;
65:12,13
discussions 25:12; 68:19
dispute 19:13; 51:5; 57:4
distraught 52:7

division 12:7; 13:11; 24:7;
35:5; 40:6,11,12,15
documentation 20:4
dollar 9:7; 43:10; 45:22;
67:2,3,13
donate 43:12
donating 42:12; 45:16
down 5:1,3,5,6; 24:20;
33:11; 65:19; 70:21
driver 6:14; 18:18; 66:11
drove 67:7
due 12:13
dues 66:14,16,19; 67:1,8,14
duly 6:7
during 5:21; 22:18; 37:2;
48:15; 57:1
duties 11:21; 13:19; 14:4,20;
24:4; 25:16; 40:5; 70:18;
73:4
duty 12:5,8; 13:16; 14:10

E

early 8:8; 48:4; 62:17
EEO 72:20
EEOC 72:8
effect 4:20; 21:17; 24:18;
43:11
eight 37:13
either 14:7
elected 61:13
election 18:11; 42:19; 47:21;
48:12; 65:12
elimination 25:22; 26:1
else 11:14; 23:2; 25:19;
28:5; 36:1,5; 37:7,12;
39:7,12; 42:11; 43:18; 47:6;
48:11,17; 49:1; 62:8; 65:14
employed 6:11,18; 11:21;
13:17; 30:6; 32:2; 38:2;
46:12; 49:5; 51:17
employee 36:21; 54:4; 69:22
employees 32:13,17;
38:9,18; 54:1; 69:12
employer 15:6
employment 11:5; 12:8;
27:15,19; 28:2,10,15; 65:1;
68:11; 69:20
empty 65:7,7
encouraged 56:10
end 45:20
ended 47:2
ending 28:9
endorse 46:22
ensuring 49:19
enter 73:21
entire 67:3
entitled 50:12; 55:10; 75:2
environment 32:18
epithet 30:15; 32:2,10; 34:14
epithets 31:20; 37:21; 38:17
equivalent 74:3
especially 5:5
evening 72:3
events 5:15,17
eventually 22:16; 67:9
everything 5:1,4; 75:2
evidence 16:19
exact 7:20; 9:7; 10:15; 18:4;
32:12
exactly 16:12; 22:12
EXAMINATION 6:9
examined 6:7
exceeded 37:17
except 12:10
exception 31:3
exclusive 40:5
excuse 42:17
Executive 58:16; 61:4

exist 8:7
exorbitant 8:22
expectation 42:2,5
expected 41:21; 43:12; 60:6
expecting 60:4
expense 26:12
expenses 9:5; 11:9
experience 45:14
explain 36:3
extent 19:15; 48:10; 50:14;
56:4
extra 67:3

F

fact 25:6; 31:17; 48:13
Fagella 57:21
failure 50:2,4
family 49:6,18; 50:3,13,20;
51:2,9,12; 62:20; 63:5,7,8
far 13:1; 25:18; 35:14;
37:16; 46:18; 51:7; 66:4
faster 6:3
fax 61:22
faxed 61:15,20
feeder 18:18
Fernicola 52:20;
55:5,9,13,20; 56:10,22; 60:4
few 14:6
fielded 46:21
file 20:2
filed 54:15; 55:18
final 73:15
finally 5:13
financial 45:11
find 22:10
fine 8:1; 12:16; 25:7; 58:7
finish 33:20; 34:4; 63:19
finished 63:17
fired 21:10,14; 22:10
firm 57:20; 58:3
firms 70:5
five 27:14; 73:14
Focusing 18:12
follows 6:8; 72:17
force 4:20
forced 10:8; 50:9
formal 51:9
formally 69:8
fortune 68:1
forwarded 51:8; 69:4
four 73:14
friend 67:22
full 27:3; 50:12
full-time 11:18; 51:15; 54:4
further 61:3

G

Gabe 36:10
gave 43:6,8; 45:13
GEB 58:13
general 38:11; 41:2; 58:16;
61:4,6; 64:17
gentleman 64:13
getting 31:3; 44:8; 49:20
Gloria 29:10
go. 65:3
gone 4:17; 69:3
Good 65:19
gotten 51:7
Granger 72:15
Grievance 13:20; 14:18;
18:20; 19:5,10,22; 20:2;
21:18; 24:1; 25:5,10; 54:15;
56:14; 60:5,5
grievances 14:22; 55:18
ground 4:16
guess 13:8; 19:13; 22:20;

Case 1:01-cv-01104-RBW   Document 69-4   Filed 12/17/04   Page 26 of 29

KAUFFMAN vs. TEAMSTERS, AFL-CIO          NOV 16, 2004 DEPO OF: W. KAUFFMAN

29:14; 32:18; 33:17; 40:3;
48:13; 68:5
guessing 61:21
guidance; 13:5

**H**

half 37:15; 71:12; 72:2
Hall 15:20; 17:16;
22:2,6,15,18; 24:15,16; 25:3;
33:11; 39:18; 40:1,10,15;
56:18,20; 57:1,6,8
hand 43:13; 65:19
handed 43:14; 65:3
Handing 15:16; 27:11; 29:1
hands 65:3
happen 46:7
happened 50:7; 66:7
happens 5:13
happy 5:11
harassment 16:11
hard 5:4,5; 16:12
head 5:9; 27:22; 39:13; 69:9;
71:17
heading 40:15
health 14:7; 51:16,20
hear 14:22; 20:21; 36:1; 37:4
heard 21:9,18,19; 34:11;
37:14; 38:19,20; 39:6
help 5:2
Henry 42:22; 43:2,6
Hey 36:15; 45:19; 46:3
Hill 67:17,20,22
Hillside 67:7
hired 7:4; 25:2; 28:1
Hoffa 44:14,17; 45:10,17;
46:3,10,14; 64:19,21
Hoffa's 64:6
Hoffman 35:5,15,19
hold 71:9
holiday 75:19
home 10:17
honest 69:14
hotel 8:15,17; 9:1
hour 70:14; 71:8
hourly 70:14; 71:4,5,6; 72:6
hours 48:15
housing 9:2; 26:1,2,6; 31:4

**I**

IBT 4:3,6,10; 7:2,3,8; 8:2,18;
9:15; 10:11; 11:4,12,15,21;
12:9; 13:17; 23:15,19;
25:9,13,17,20; 26:14;
27:15,20; 28:1,10,15; 30:6;
32:2,13,17; 36:21;
38:2,10,18; 39:14; 40:6;
42:11; 45:3,14; 46:13; 48:20;
49:5,6,14,18,18,19;
50:2,3,6,7,13,19;
51:2,12,17,19; 52:2; 53:3,7;
56:13; 58:19; 59:5,20;
60:2,4,8,19,22; 62:16;
63:5,22; 65:14,21; 66:3;
68:11,12; 69:20
IBT's 11:20
IBT; 7:1
identified 11:20; 27:14;
67:17
ignore 6:1
illness 5:15
immediate 39:9,15
immediately 22:8
impact 26:11
impair 5:17
impairment 66:11,12
impairs 5:15
impression 45:13

improper 48:12,22
inappropriate 34:12; 36:17
inauguration 64:6
income 11:1; 26:11; 30:5
incomes 37:16
inconsistent 75:15
increase 26:18,21; 67:2,13
independent 68:11; 72:8,20;
73:12
indicate 11:10; 21:19; 25:3;
67:14
indicated 12:1,17; 23:22;
63:4; 73:1
indicates 55:9
individual 18:6,8; 30:6
individuals 37:14; 48:14,18;
54:3
inform 10:11,14; 23:15
information 12:3; 13:2;
18:22; 19:16,20; 20:11,18;
24:6; 69:5
information; 20:1
informed 21:6; 55:20
informing 58:7
initial 19:19
initially 9:4,16; 21:8; 23:8;
37:4; 67:1
inquire 52:5,6
inquiries 12:2
instance 43:4
instances 44:9,11; 46:7,9,19
interested 22:4
international 6:21; 7:9; 13:2;
23:13; 25:1,17; 38:6; 40:9,17;
41:20; 42:15; 58:16; 60:7,10;
68:2
interrogatories 11:20; 27:9;
74:18
interrogatory 23:22;
27:10,13,17; 69:17
intervention 58:15
interview 73:6
investigate 60:7; 73:6
investigator 72:9,21
involuntary 67:12
involve 12:19; 14:20; 24:5;
70:3,18
involved 12:2,20,22; 13:19;
42:10,20; 44:8; 46:16; 47:3;
61:9
involved, 45:21; 46:4
isolated 43:5
issue 13:13; 18:7; 26:7;
37:8,11; 48:13; 54:18; 56:15;
59:22; 62:10,16,20
issued 67:9
issues 19:4; 62:7; 63:18

**J**

Jersey 7:13; 8:3; 9:19,22;
10:7; 11:1
Jim 46:3,14
job 10:11,15; 14:1; 18:17;
47:4; 51:15; 66:10; 68:8,8;
71:10; 72:3
jockey, 38:20
Joe 21:12; 42:15
John 68:20
Johnson 74:22; 75:4,15
join 20:9
June 57:10

**K**

Kansas 61:15
Katherine 4:5
Kauffman 4:3,5; 6:5,11;
11:19; 15:11,15; 17:7,11;

27:4,8; 28:17,21; 31:15;
52:8,12; 54:5,9,21; 55:3;
57:13,17; 59:9,13; 67:17;
69:12; 72:19
Kauffman's 74:19
keep 11:11,15
Ken 15:20,22; 17:16; 24:15
Kentucky 14:17; 15:3; 16:3;
20:22; 21:7; 22:15; 23:20
kept 67:8
kind 36:15
kitchen 38:19

**L**

lack 40:3; 62:19
ladies 33:12
lady 33:12
language 18:4; 53:20; 60:14
last 7:6; 12:11; 52:16; 64:14
lasted 71:11; 73:1
late 10:9; 21:4; 39:21;
63:3,15
later 39:17
Latin 33:12
law 4:21; 35:12; 57:20; 58:3;
70:5
lawsuit 4:6; 69:2
lead 16:18
learn 24:12; 40:21; 41:7
learned 22:9
least 32:9; 37:15; 51:7
leave 28:4,6; 48:19;
53:3,7,19; 54:3
leaves 48:21
leaving 65:18
led 62:18
left 36:4; 62:22; 63:19
legal 58:21; 60:9
length 28:15
Let's 6:13; 9:12; 33:20; 35:1;
38:12
level 29:21; 31:8; 36:17;
39:22
liaison 12:17; 24:3,4,9
lifetime 28:6
likely 16:18
line 33:20; 43:18; 62:19
list 69:20
listed 27:17; 68:20
listen 30:8; 31:10; 33:18
little 19:7; 35:2; 42:16; 68:13
live 8:22; 50:9
lived 51:11
living 8:3,13; 11:9
Local 17:11,15,18; 12:2;
13:4,9; 15:3,4; 17:20; 28:5;
36:22; 44:22; 45:3,6,8;
47:8,14; 50:22; 53:2,15,18;
54:16; 55:19; 56:14; 58:4,20;
59:6; 60:4,9,11,12,16;
66:2,14,19,21; 67:10; 68:4,6;
74:3
lodge 16:17
long 8:7; 51:12; 63:12;
66:18; 71:15; 72:11
longer 41:6
look 33:6; 54:11
looked 65:5
looking 14:9
loop 75:14
lot 57:3
luck. 65:20

**M**

main 14:7
maintenance 71:22,22
majority 14:5

make, 36:16
Management 70:16; 72:2
mandatory 55:16
manner 30:3,16; 48:20
March 27:2; 41:4; 62:1;
64:11
Mario 7:5; 11:7; 28:8
market 10:9
Mary 52:19
master 53:14,17,21; 60:15
matter 4:2; 28:22; 44:7;
55:11; 58:14; 63:17
matter. 19:11
matters 62:6
maybe 12:11; 22:16; 37:13;
61:21; 63:12; 64:5; 71:11,18
MCDONOUGH 4:2,5,13,16;
5:19; 6:2,10,17; 15:14; 16:20;
17:10; 27:7; 28:20; 33:20;
34:4,6,18,21; 52:11; 54:8;
55:2; 57:16; 59:2,12; 69:6,11;
72:18; 74:17; 75:3,7,11,18
media 41:1
medical 20:3,11,18
medication 5:14,16
meet 41:3
meeting 31:7,22; 56:8
member 12:1; 13:3; 24:19;
60:10; 66:2
members 46:22; 48:5
memo 17:1,16,19; 21:4
memorandum 15:19
men's 33:19
mental 5:16
mention 35:8; 37:18; 65:10
mentioning 62:7
mentor 68:9
Metropolitan 71:22
mid 8:8,10; 9:16,18; 10:4,16;
11:1; 24:10; 39:21
mid-March 64:7
mine 37:17
minute 15:17; 22:16; 52:13
mistaken 19:12
moment 17:12; 25:19;
34:16; 46:11; 49:4; 54:10
money 11:8; 42:12; 43:12;
44:10; 45:15,17; 50:7,12,15;
51:11,13
month 41:21
month/month 72:2
monthly 9:5
months 41:9; 63:13;
71:12,18; 72:12; 73:2
morning 4:17; 30:10; 34:1
motivated 38:9
move 9:10; 11:15
moved 9:12,14; 70:20

**N**

name 4:5; 7:6; 20:16; 21:21;
24:21; 44:18; 64:13,14
National 13:20;
53:12,14,17,21; 60:15,18
nature 31:8
necessary 28:11
need 11:8; 50:14; 75:7
needed 16:21; 19:20;
20:3,4,19; 56:11
negotiations 12:18,21; 13:1
neutral 15:3
New 7:13; 8:3; 9:19,21; 10:6;
11:1; 61:9; 62:13
news 41:1
next 6:3; 35:17
No; 30:13; 36:22; 45:22;
65:18
Nodding 69:9

Case 1:01-cv-01104-RBW   Document 69-4   Filed 12/17/04   Page 27 of 29

**KAUFFMAN vs. TEAMSTERS, AFL-CIO**                    **NOV 16, 2004 DEPO OF: W. KAUFFMAN**

**non-verbal** 5:8
**None** 38:4; 40:14
**northwest** 12:18
**notes** 14:2
**Nothing** 17:5; 22:12
**notice** 4:4; 58:13
**notified** 64:12
**November** 26:16; 73:22
**Nowak** 57:21
**nurses** 33:10,13

**O**

**oath** 4:19
**Obester** 72:14
**object** 5:22
**Objection** 6:16; 16:18; 58:21
**obviously** 40:8
**occasion** 25:7
**occasions** 32:22; 67:6
**occur** 21:3; 39:20; 47:9,19;
48:3,8; 57:9; 61:19; 63:2,11;
64:6
**occurred** 15:22; 33:17; 41:4
**off** 27:21; 39:13; 50:10;
51:11; 57:11; 69:10; 71:17;
72:13
**office** 21:9; 32:18,21;
33:5,11; 36:4; 39:3,9; 49:3;
61:15; 65:2,18
**offices** 32:19; 34:13; 35:18
**official** 21:8,11; 44:19,21;
45:5; 47:8,15; 74:1
**officially** 22:13; 40:2
**officials** 44:14,16; 45:9
**offset** 11:9
**Okay** 5:19; 7:21; 8:1,13;
9:2,8,12; 12:16; 13:8; 16:14;
19:18; 22:4; 24:4; 26:9;
34:18; 36:12,21; 42:21;
49:12,21; 50:17; 62:4; 71:19;
72:8
**Oklahoma** 44:19,21; 45:1,4;
47:9
**once** 32:9; 39:8; 42:8,9,15
**one;** 60:6
**ongoing** 13:16; 48:9,10;
68:7
**open** 19:17,17
**opportunity** 13:12; 56:5;
62:13
**opposed** 8:22
**option** 28:12
**order** 11:11
**outside** 58:4
**outstanding** 18:5
**overhear** 32:22
**overheard** 35:15; 39:8
**own** 10:19

**P**

**P-a-s-s-o** 64:15
**P-e-r-r-u-c-c-i** 7:7
**P-i-e-r-a-n-i** 21:12
**P-R-O-C-E-E-D-I-N-G-S** 4:1
**package** 6:13; 40:6; 66:11
**page** 27:11; 29:2,7; 30:18;
35:11; 52:16; 54:11; 59:17;
69:18
**panel** 13:9,12,14,20;
14:1,7,18; 16:3; 19:19,22;
20:7,11,14,18; 21:7,18;
22:15,22; 23:2,4,9,16,20;
24:2,3,9,9,19,20; 25:5,10,14;
37:9,11; 47:10
**panel's** 16:6,14; 18:2; 20:10
**panel;** 20:22
**panels** 12:15; 13:5; 15:7

**papers** 65:2
**paragraph** 16:5; 17:1,3,19;
19:9; 29:8; 30:21; 34:22;
35:2,3,16; 36:8; 37:3; 41:17
**Parcel** 59:7
**park** 70:13
**part** 12:10; 44:5; 61:12
**participant** 7:15; 49:6,8
**particular** 13:14; 31:22;
47:1; 48:15
**parties** 73:6
**passed** 34:11
**passing** 39:8
**Passo** 64:13,16,22; 65:8
**past** 23:7; 39:6; 45:14,19;
53:8; 55:18
**patch** 70:21,22
**Patricia** 35:4
**pay** 53:1,6,18; 66:16
**paying** 8:22; 11:1; 66:14
**pension** 7:16,18; 26:7; 49:6;
53:1,2; 55:10,12,18; 56:14;
58:20; 59:22; 62:10,16;
63:22; 66:1; 74:14,15
**people** 5:6; 32:17,21; 41:2;
46:16; 49:2; 70:20
**per** 41:21; 73:12,13
**perform** 14:3
**performance** 25:4
**performed** 14:10; 69:1
**period** 8:14,16; 12:4,22;
14:3,15; 24:8; 46:21; 47:17;
64:4; 71:9
**Periodically** 15:21
**Perrucci** 7:5; 11:7,10,16;
28:8,13; 39:17; 62:22;
63:10,16; 68:19
**Perrucci's** 7:6
**Perrucci;** 39:15
**person** 5:5,7; 37:20; 47:1;
70:19
**personal** 67:22
**personally** 16:21
**Perusing** 15:18; 17:13,22;
27:12,21; 29:6; 52:15; 59:16
**Phil** 61:11
**phone** 48:8
**physical** 5:16; 66:12
**physically** 67:7
**Pierani** 21:12,13; 22:1
**place** 23:16
**placed** 23:4,19; 52:12; 54:9;
55:3; 57:17; 59:13
**plain** 31:14
**plan** 7:16,19; 14:13;
49:12,14,18,20;
50:3,7,13,20,22;
51:2,9,12,16,20; 53:2;
55:12,21; 56:3,10; 58:20;
59:6; 60:7,9,12; 62:20; 63:5,7
**plan;** 49:6; 58:4
**plans** 53:22
**Please** 54:10
**pledge** 41:21; 42:7
**point** 6:3; 22:9; 33:9; 44:4;
47:13; 51:3,22; 52:7; 56:6;
61:20; 64:7; 66:15
**politically** 46:16
**pool** 33:10
**portion** 26:19,20
**position** 7:8; 23:6; 38:5;
40:20,22; 41:8; 68:2; 70:1,8;
71:2,15; 72:11,20;
73:1,4,9,15,19,21; 74:9
**positions** 40:10; 41:12,14
**possible** 5:2; 52:5
**possibly** 56:19; 68:18
**posted** 41:14
**practice** 28:6; 53:9

**practicing** 35:13
**prep** 70:19
**presence** 12:15; 32:3
**present** 20:20; 32:7;
42:4,21; 43:2,15; 56:6,7,12
**President** 42:19;
61:7,8,10,11; 64:18
**president,** 46:3
**Pretty** 13:18; 47:7
**previous** 13:5,12; 62:6
**previously** 44:7
**prior** 4:9; 11:7; 23:10; 47:13
**privileged** 22:5
**probably** 5:22; 14:5; 21:4;
37:16; 41:1; 47:16; 57:10;
66:20
**problem** 25:4
**procedural** 19:4
**procedure** 60:6
**process** 60:5
**promotions** 41:13
**proposal** 8:18,19
**provide** 20:3
**provided** 13:4; 75:4
**providing** 13:1,8
**Public** 6:7
**pursuing** 56:14
**put** 10:9; 17:11; 22:21;
23:1,16

**Q**

**questioning** 33:21
**questions** 21:16
**quick** 21:16
**quickly** 11:22; 30:10; 34:5
**quite** 68:4

**R**

**race** 30:2,11,13; 31:6,11;
35:8; 37:18; 65:10
**racial** 30:14,14; 31:20; 32:2;
37:21; 38:17
**racially** 38:9
**raise** 26:15,15,17
**raises** 26:13
**ran** 51:14
**rate** 72:6
**rather** 67:2; 74:18
**reading** 41:1
**Realizing** 61:6
**really** 5:4; 33:18; 50:16;
63:17
**reason** 16:9; 40:4; 66:21;
67:14
**reasonable** 18:14
**reasonably** 16:18
**reassigned** 23:5,6
**receive** 26:13; 50:11; 52:2;
55:7; 58:1; 61:16
**received** 26:15,19,20; 50:15;
51:22; 58:11; 69:6
**recess** 34:20; 57:12
**recognize** 15:19; 17:14;
55:4; 59:14
**recommended** 68:1
**recording** 14:2
**red** 37:18
**reduce** 44:1
**reduction** 12:11,13
**reductions** 26:2,5
**refer** 17:18; 27:10; 29:10,19;
30:21; 31:17
**reference** 30:1,11,13;
31:5,11; 35:4; 36:10; 45:16
**reference"** 31:13
**referenced** 16:22; 17:4;
34:12; 35:16; 37:3,10; 48:5

**referencing** 32:13,16;
33:13,15
**referred** 33:10; 38:20,21;
55:21; 73:5
**referring** 15:2; 18:6; 19:11;
31:16; 44:2,5,22; 45:6,11;
53:11; 60:15
**refers** 16:2; 17:19; 55:17
**refrained** 44:8,15
**refused** 42:20
**refusing** 67:8
**regard** 38:22; 44:12; 47:8
**regarding** 18:10; 25:14;
26:7; 36:17; 39:4; 48:3; 52:3;
55:18; 59:22; 63:22
**regards** 19:13
**region** 47:10
**regional** 12:18; 24:1;
25:5,10
**regular** 54:4
**reimbursed** 9:5,15
**reimbursement** 9:6
**reimbursing** 9:17
**related** 19:4; 74:19
**relates** 16:5
**relief** 18:13; 60:2
**relocate** 11:6,11
**remedy** 63:20
**removal** 22:15; 25:9,14;
47:13
**removed** 12:14; 20:22; 21:6;
24:11,12,17
**rent** 10:19
**rental** 10:21
**renting** 8:15
**repeated** 37:6
**rephrase** 5:12
**replaced** 39:18; 67:6; 72:15
**report** 15:21; 73:7
**reported** 12:6
**reporter** 4:22; 72:15,16
**represent** 4:6
**representation** 75:14
**representative** 7:9; 23:13;
25:1,17; 38:6; 42:16; 44:22;
45:6; 68:2; 73:16; 74:2
**representatives** 14:21; 15:6;
40:9,17; 41:21
**represented** 7:11
**request** 46:1; 56:7,9; 67:12;
69:8; 74:18
**requested** 74:19
**requesting** 18:14
**requests** 12:3
**required** 8:9; 11:5; 53:1,6,18
**requires** 53:22; 54:2
**residence** 8:11,12; 9:18,21;
10:6,12,19,22
**resolve** 51:5
**resolved** 63:1
**respect** 39:4; 49:18;
50:19,22; 51:2,20
**respond** 62:14
**responded** 65:6
**responding** 12:2
**response** 21:16; 27:13,17;
37:8; 42:10; 60:19; 61:16
**responses** 11:19; 23:22
**responsibilities** 8:9; 68:8
**responsibility** 51:5
**responsible** 12:2; 49:19
**retirement** 70:8; 71:1; 72:4;
73:8; 74:8,11
**retrieving** 24:7
**return** 28:12; 66:8
**returned** 21:17
**returning** 66:21
**review** 15:17; 17:12; 52:14;
54:10

Case 1:01-cv-01104-RBW   Document 69-4   Filed 12/17/04   Page 28 of 29

**KAUFFMAN vs. TEAMSTERS, AFL-CIO**                    **NOV 16, 2004 DEPO OF: W. KAUFFMAN**

Richard 72:14
rights 52:3,5
rings 17:5
road 16:1; 44:13
roll 50:8
rolled 50:9; 51:12
Ron 24:22; 44:10,12;
46:14,20
room 32:6; 33:19; 37:14,20;
43:15
rooms 8:15,17
rules 4:17; 48:16
ruling 16:6,14; 18:2,5; 19:19;
20:10
rumor 21:14,20; 22:9
run 14:1

**S**

safety 14:7
salary 25:20,21; 26:3,4;
70:12; 73:11; 74:5
say, 37:5
saying 5:6; 19:1,21; 22:18;
45:20
saying; 5:5
says 58:10
scheduled 75:10,12
scope 6:16
Seattle 12:20
second 19:9; 48:18; 54:11;
59:17
secretaries 33:4,14,16;
34:12
secretary 39:2,7
Security 65:6; 70:15; 72:2
seeking 18:13; 60:2
sell 10:8
send 13:15; 66:17,18;
67:3,5,11
sense 30:7
sent 15:20; 17:16; 52:19;
56:4; 59:19; 61:4; 67:3
sentence 19:9
serve 24:3,8
served 24:1; 58:13
Service 59:8
seven 37:13
Sever 58:14; 64:3
sex 16:11
shake 5:9
shared 35:18
she's 5:3; 35:13
sheetrock 70:22
shook 65:19
short 8:14,16; 35:9
shouted 36:15
show 15:15
side 32:19,19
signature 29:5; 52:17;
54:13; 59:17
similar 13:13
simply 27:16
single 30:8
singled 37:20
singling 31:7
sit 14:6,22
sitting 24:19; 32:20; 35:17;
61:8
situation 8:7
situations 14:6
six 71:18
skin 31:12
skin; 31:16
slur 30:14; 32:2,10; 34:14
slurs 31:21; 37:21; 38:17
small 40:5
solely 55:11
solicit 48:14

soliciting 49:2
someone 22:22; 23:1; 33:5;
39:7; 46:13
something 18:17; 21:16;
24:18; 32:12; 33:17; 34:11;
37:7
sometime 39:17
sometimes 5:13; 70:4,22
somewhat 52:6
Somewhere 9:9; 70:13;
71:7; 73:13
soon 75:8
Sorry 64:9,21; 69:17; 70:7
sort 5:14
southern 24:1; 25:4,10;
47:10
Speak 5:2; 60:22
speaking 10:3; 30:12,15;
33:1,2,3
specific 17:5; 34:8,14;
45:16,22; 47:11; 68:13
specifically 16:16; 18:12;
27:10; 29:8; 30:21; 32:5;
46:17; 54:11; 62:7
specifics 18:18
specified 28:2
spell 7:6; 36:12; 64:14
spent 8:21; 14:8
spoke 21:22; 22:2,3; 30:17;
62:11
sponsor 59:5,7
staff 40:9; 73:16; 74:2
staffing 40:18
stands 18:10
start 6:13; 9:13; 38:12
started 6:19; 7:3; 36:3
state 4:9
stated 51:11
statements 28:13
stay 72:11
staying 8:15,17
Stewart 29:11,13,19;
30:1,14; 31:9
stopped 9:17
straight 74:13
subject 55:16
submit 9:4
submitted 8:19
summary 22:21
supervision 39:22
supervisor 29:16; 39:15;
71:21
supervisory 38:3
supplement 53:15,18; 54:2;
60:16
supplemental 13:14;
53:12,13
supply 75:1
support 18:22; 19:16,20;
44:14; 45:11; 46:3,13,20;
48:6; 49:2; 70:5
supporting 20:3; 44:17;
45:10; 46:10
supporting, 45:20
supposed 75:6
sworn 6:7

**T**

table 34:1
taken 34:20; 57:12
taking 5:1,14
talk 31:8
talked 25:22
talking 5:6; 32:21; 35:19;
37:5; 72:20
talks 5:7
tape 14:2
tax 11:2; 74:19

Teamster 14:13
Teamsters 6:21; 7:11; 74:3
telephone 47:1
temporary 69:22
term 40:3; 61:7; 62:19
terminate 28:2; 64:22
terminated 12:9; 27:2; 41:7;
50:6; 64:10; 65:22; 66:3;
69:12,13
termination 14:11,16; 40:19;
41:4; 52:1; 64:12; 65:15
terms 27:19; 49:1
testified 6:8
testimony 4:20
Texas 44:20; 45:5,7; 47:15
Thanks 45:20
Thanksgiving 75:19
there's 26:7; 51:4
they're 5:6; 58:6
thing 4:19,22; 12:1,14; 51:21
things 6:2; 15:22; 30:9;
31:19; 32:22
think 15:5; 21:8; 25:19;
27:18; 30:9; 31:14; 33:9,11;
34:4,18; 38:13,16; 46:11;
47:7; 48:11; 49:4,11; 51:21;
52:6; 62:12; 63:6; 64:11;
65:6; 71:7,11,18; 72:19;
75:20
THOMPSON 5:20; 6:16;
16:17; 33:22; 58:21; 69:9;
75:1,9,13
thought 48:15
three 17:19; 32:19; 44:11
times 69:4
title 29:15; 74:1
today 4:7; 5:1; 38:16; 46:18;
48:11; 75:4
told 9:4; 24:13; 28:1,4,7;
57:4; 68:10
took 10:22; 31:3
top 27:21; 39:13; 71:17
Towards 38:11,12
transpired 16:13
travel 26:12
traveling 12:20; 26:11
treated 54:3
Trish 23:5; 30:22; 35:17,21;
40:3; 42:3; 65:19
true 22:10
trust 58:8
trustee 14:12; 56:8; 58:19;
68:3,5
trustees 14:13; 55:11,21;
56:2
try 5:3,8; 46:22; 63:20
trying 50:17; 51:5
turn 29:2,7; 30:18; 34:22;
35:3; 36:8; 41:10,11,17;
52:16; 56:10; 69:16
turned 37:16
Tweedie 52:20
two 5:6; 12:15; 14:21;
15:1,3; 16:2; 17:3; 18:5;
21:15; 22:16; 33:12; 60:6;
67:6
two/two-and-a- 71:11

**U**

Uh-huh 29:9; 30:20; 40:13;
43:1; 54:12; 57:22; 60:1;
69:21
Uh-huh, 5:9
understand 5:10; 44:2; 46:2;
49:21; 50:21; 75:16
understanding 19:18; 20:4;
45:10; 60:3; 75:3
unfinished 62:6

union 12:3; 20:6,9,13,13;
21:8,11; 36:22; 44:13,16,22;
45:6,8; 47:8,15; 58:16;
60:10,11; 74:4
unions 13:4,9; 14:22;
15:1,1,3; 68:6
unit 54:1
United 59:7
Unless 52:2
unresolved 58:14
uphold 16:22; 18:19
upon 51:22
UPS 6:11,14; 7:10,16,18;
12:18; 14:13; 28:12; 47:5;
48:19; 53:1,2,5,14,18; 55:12;
58:4,20; 59:6; 60:9,12; 66:5
use 30:14; 31:20; 32:2;
51:13
used 32:10; 34:15; 37:21;
38:17; 63:6
Usually 4:8

**V**

vacant 41:15
various 16:1; 44:13; 70:5
versus 4:3
vest 7:18; 49:12
vested 7:21
Vice 42:19; 61:8,10,11
view 28:11
violation 48:16
Virginia 10:12,20,22; 11:1
vote 18:19
voted 16:21
votes 18:11

**W**

W-2 74:19
wage 71:6
waited 43:5
waiting 62:12
walk 45:21
walked 46:4
walls 70:21,21
Wanda 72:15
wanted 22:21; 23:1; 24:20;
28:12
Washington 11:6; 18:11;
56:22; 61:18
wasn't 20:20; 33:2; 45:3;
63:12
Wayne 52:20; 55:4
we'd 69:7
We'll 4:16; 12:16; 26:9;
33:21; 36:12; 49:21; 50:22
We've 25:22; 34:1; 46:18;
51:7; 69:3
week/ten 61:21
welfare 51:16,20
well-aware 40:2
went 11:20
whatever 40:4; 63:8; 64:3
whether 4:8; 16:21; 35:12;
51:4; 55:10; 56:1; 58:19;
60:8
whole 33:18
whom 21:19; 24:14; 33:3
wide 19:17
Wilder 4:7
will 5:1; 6:2; 19:10; 30:9;
46:3; 75:1,6,22
William 4:2,7; 6:5; 67:17
Willie 36:16
withdrawal 67:9,11
within 32:18; 41:9; 55:11
Without 16:12; 53:20; 62:7
wondering 19:7

**word** 63:6
**words** 34:8; 37:19; 43:11
**words;** 32:12
**worked** 11:16; 23:8; 33:11; 34:13; 70:15
**Workers** 73:16
**working** 7:10; 8:2; 13:11; 39:14; 48:15
**write** 73:7
**wrongdoing** 49:17; 50:19; 51:19

**Y**

**Y-b-a-r-r-o-l-o-z-z-a** 36:13
**Ybarrolozza** 36:11,19,20; 37:2,18,22
**Yeah** 15:21; 17:22; 25:2; 35:21; 38:7; 40:16
**Yeah;** 13:11; 23:8; 68:17
**year** 10:10; 12:12; 47:12; 49:9
**years** 14:9; 68:4,8
**yes;** 9:16; 17:17; 60:17; 71:5
**you'll** 15:17; 52:13,16
**you;** 38:5
**Young** 61:11,14,16; 62:4,11