UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
WILLIAM LEE KAUFFMAN,               )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )         Civil Action No. 01-1104 (RBW)
                                    )
INTERNATIONAL BROTHERHOOD           )
OF TEAMSTERS, AFL-CIO,              )
                                    )
        Defendant.                  )
                                    )
                                    )
_____)

## <u>MEMORANDUM OPINION</u>

On May 22, 2001, the plaintiff filed a multi-count complaint[1] against three defendants

seeking to have his alleged employment discrimination, among a number of other claims,

redressed.[2]  Amended Complaint ("Compl.") ¶¶ 168-213.  This Court previously dismissed the

claims filed against two of the defendants[3] and a number of counts against the remaining

_____

[1]  The plaintiff's initial complaint listed seven causes of action.  His amended complaint, filed on November 5, 2001, lists eight counts.

[2]  Specifically, the plaintiff alleges that the defendants  (1) wrongfully discharged the plaintiff in violation of public policy, Compl. ¶¶ 168-71; (2) engaged in race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and the District of Columbia Human Rights Act of 1977, D.C. Code § 1-2512(a) ("DCHRA"), Compl. ¶¶ 172-80; (3) engaged in race discrimination in violation of 42 U.S.C. § 1981, Compl. ¶¶ 181-87; (4) breached their duty of good faith and fair dealing, Compl. ¶¶ 188-93; (5) violated sections 101(A)(2) & (5) and § 609 of Title I of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 411(a)(2)-(5), 529 ("LMRDA"), Compl. ¶¶ 200-05; (6) violated §§ 101(A)(3) & (4) of Title I of the LMRDA, Compl. ¶¶ 206-10;  (7) violated the Employee Retirement Income Security Act, 29 U.S.C. § 1140 ("ERISA"), Compl. ¶¶ 211-l3; and (8) violated the Americans with Disabilities Act, 42 U.S.C. § 12,132 and the DCHRA, Compl. ¶¶ 214-31.

[3]  The plaintiff filed claims against three defendants: the International Brotherhood of Teamsters; Teamsters Local 177; and Local 177/UPS Pension Plan.  Compl. at 1.  However, on July 30, 2002, defendant Local 177/UPS Pension plan was dismissed as a defendant pursuant to a Stipulation and Order of Dismissal with Prejudice issued

(continued...)

defendant.[4]  The remaining defendant is the International Brotherhood of Teamsters, AFL-CIO

("IBT").  Currently before the Court is the IBT's Motion for Summary Judgment and its

Memorandum of Points and Authorities in Support of Defendant IBT's Motion for Summary

Judgment ("Def.'s Mem."); the Plaintiff's Response in Opposition to Defendant's Motion for

Summary Judgment ("Pl.'s Opp'n"); and Defendant IBT's Reply in Support of its Motion for

Summary Judgment ("Def.'s Reply").  For the reasons that follow, the IBT's motion is granted.

## I.   Factual Background

In early 1992, the plaintiff was an employee of the United Parcel Service ("UPS") with

seniority status and a member of the Local Union 177 ("Local 177").  Compl. ¶ 12.  While

employed at UPS, the plaintiff sustained a permanent injury in December 1989 for which he

received worker's compensation.  Id. ¶ 18.  In April 1992, the plaintiff was contacted by Mario

Perrucci, International Vice-President at Large of the IBT, regarding potential employment

opportunities with the IBT.  Id. ¶ 19.  Later that year, pursuant to a collective bargaining

agreement between UPS and Local 177, the plaintiff was granted a leave of absence from UPS so

that he could begin work on May 31, 1992 for the IBT as an International Representative for the

Parcel and Small Package Division.  Id. ¶¶ 11-14, 23.  As an International Representative, the

plaintiff monitored the Southern Region Area Parcel Grievance Panel to ensure proper

---

[3](...continued)
pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure.  Moreover, on November 21, 2003, this Court
dismissed the claims against Teamsters Local 177 because this Court lacked personal jurisdiction over that
defendant.  November 21, 2003 Order.

[4]  As noted previously, two defendants, and accordingly all claims against those defendants have been
dismissed.  Moreover, in a September 30, 2002 Memorandum Opinion, this Court granted the IBT's motion to
dismiss the plaintiff's § 1981 claim, his Title VII claim for alleged adverse employment actions that occurred
between 1994 and 1998, and his "state law" claim for wrongful discharge based on alleged violations of public
policy.  Kauffman v. Int'l Bhd. of Teamsters, Gen. Executive Bd., No. 01-1104, at 27 (D.D.C. Sept. 30, 2003).

coordination of the local panel with the national level, and served as union chair for the Kentucky

State United Parcel grievance panel.  Id. ¶¶ 28-29.  In this position, the plaintiff was told by

Perrucci "to stay out of the union politics."  Id. ¶ 27.  Initially, the plaintiff worked both at the

IBT's New Jersey office and at the IBT's International Headquarters in Washington D.C.,

commuting from New Jersey to Washington D.C. every week, until the spring of 1993 when his

main responsibilities were shifted to the Washington D.C. office.  Id. ¶¶ 23-26.  During this

period, the IBT provided the plaintiff with reimbursement equal to the cost of renting both an

apartment and furniture in Washington, D.C. since he maintained a home in New Jersey, despite

the fact that the majority of his work was in this jurisdiction.  Id. ¶ 32.

According to the plaintiff, at some point in late 1993 or early 1994, he began to be

subjected to numerous acts of discrimination.  The plaintiff first alleges that he was "called to

meet with the General President" regarding his receipt of the housing reimbursements and

"subjected . . . to comments about his compensation" that "he does not believe . . . would have

been made if he were not a Black American."  Id. ¶¶ 33-36.  Following these conversations, in

mid-1994, without notice or explanation, the IBT allegedly stopped reimbursing the plaintiff's

housing expenses.  Id. ¶ 37.  The plaintiff then had discussions with Perrucci and others during

which he requested reinstatement of his housing reimbursement.  Id. ¶ 41.  Soon thereafter, the

IBT amended the plaintiff's housing reimbursement to a taxable amount of $1,000 per month.

Id. ¶ 44.

The plaintiff also alleges that after the IBT, Local 177, and UPS informed him that he was

not entitled to participate in Local 177 Pension Benefit Plan while employed at the IBT, the

plaintiff asserted his "entitlement to continued credit in the [Local] 177 Pension Plan."  Id. ¶¶ 42,

148.  However, the plaintiff alleges that beginning in February 1996, several other UPS employees were permitted to take leave of absences with continued participation in the UPS benefit plans.  Id. ¶ 49.

Additionally, the plaintiff contends that despite the fact that he was prohibited from engaging in political activity, other International Representatives, such as Patricia Callahan, "had been pressuring the plaintiff to participate in the campaign to elect a new IBT president, including donating $1,000 per month to the Carey Campaign."  Id. ¶¶ 51, 62-63, 66, 73. Moreover, the plaintiff opines that there were a number of racially motivated comments made during his tenure at the IBT.  For example, in March 1996, in response to a report that the plaintiff sent to his direct supervisor, "[Mr.] Hall[,] and [also to Ms.] Callahan regarding some discussion at the Southern Region Area Parcel Grievance Panel meetings," Callahan allegedly claimed that the plaintiff was "not doing his job."  Id. ¶¶ 55-56, 73.  Moreover, the plaintiff alleges that Callahan made other comments regarding the plaintiff's housing allowance, stating that no one should be paid more than anyone else, which the plaintiff believes was, "in part, racially motivated."  Id. ¶¶ 57-59.  In April 1996, the plaintiff "was notified that his negotiated housing benefit was being terminated" and when the plaintiff made a request to discuss this decision, he claims his request was ignored.  Id. ¶¶ 60-61.  Then, in mid-1996, the plaintiff asserts that Callahan made additional discriminatory statements regarding the possibility of the plaintiff's "constructive discharge."  Id. ¶ 65.

In mid-1997, the plaintiff was removed from his position as Liaison to the Southern Region Area Parcel Grievance Panel.  Id. ¶ 67.  Moreover, following the filing of a formal complaint alleging that he had been subjected to additional discriminatory comments to which no

investigation ever took place, the plaintiff claims he was retaliated against by being accused of being late for a meeting and eventually being removed from his assignment to the Kentucky State Panel.  Id.  ¶¶ 74-77.  Following his removal from this panel, the plaintiff was denied reimbursement for his travel expenses.  Id. ¶¶ 79-81.  Despite a request by the plaintiff for an explanation as to why he was removed from the panel and why his travel expenses were denied, none was ever provided.  Id. ¶ 82.  In June 1998, the plaintiff filed a grievance with Local 177 in order to pursue, administratively, his Health, Welfare and Pension Benefit Rights as provided for in the collective bargaining agreement.  Id. ¶ 87.  However, the plaintiff was informed that the Department of Labor had previously decided the issue in 1995.  Id. ¶ 87.  The plaintiff requested a copy of the decision, but he claims that he never received one.  Id.  ¶ 89.

On June 17, 1998, a letter and a list of names was published by the IBT, which identified the plaintiff and other individuals who were to be terminated pending the outcome of the impending the IBT election.  Id.  ¶ 92.  The plaintiff, believing that he was fired for his failure to contribute to the campaign of one of the participants, filed a grievance claiming that he had a right to decide whether he wanted to participate in the election activities.  Id. ¶¶ 98, 103. However, Mr. Fernicola, the Local Union 177 Secretary-Treasurer, allegedly refused to process the plaintiff's grievance because he believed the grievance was inappropriate.  Id. ¶ 101.  On October 22, 1998, the plaintiff requested that the Full General Executive Board intervene and assist the plaintiff with his grievances, however, the plaintiff never received a response.  Id. ¶¶ 107-08.  The plaintiff then contacted Vice President Phil Young for his assistance, but again did not receive a response.  Id. ¶¶ 109-10.

On March 29, 1999, the plaintiff filed suit in the Superior Court of the District of

Columbia ("Superior Court") alleging breach of contract based on the denial of his negotiated

housing allowance.  Id. ¶ 111.  On March 30, 1999, the day after the plaintiff filed his complaint

in the Superior Court and eleven days after James P. Hoffa assumed the office of General

President, Hoffa's personal assistant came to the plaintiff's office and terminated his position

with the IBT without any prior notice or explanation.  Id. ¶ 112.  When the plaintiff attempted to

return to work at UPS, he was denied employment purportedly because of his loss of seniority

and physical disability for which he had received a worker's compensation determination.  Id. ¶¶

90, 117-18.  The plaintiff filed an additional grievance in June 1999 with Local 177, but Local

177 allegedly refused to process it promptly.  Id. ¶ 125.  Eventually, in June 2000, Local 177

allegedly processed a grievance report "in his name," which the plaintiff claims was not

"identical" to the grievances he had filed.  Id. ¶¶ 126-27.  The filing of this action followed.

## II.   Standards of Review

This Court will grant a motion for summary judgment under Rule 56(c) if "the pleadings,

depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  When ruling on a motion for summary

judgment, this Court must view the evidence in the light most favorable to the non-moving party.

Bayer v. United States Dep't of Treasury, 956 F.2d 330, 333 (D.C. Cir. 1992).  However, the

non-moving party cannot rely on "mere allegations or denials . . . , but . . .  must set forth specific

facts showing that there [are] genuine issue[s] for trial."  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986) (citation omitted).  Under Rule 56, "if a party fails to establish the existence

of an element essential to that party's case and on which that party will bear the burden of proof

at trial" summary judgment is warranted.  Hazward v. Runyon, 14 F. Supp. 2d 120, 122 (D.D.C. 1998) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  The party moving for summary judgment bears the burden of establishing the absence of evidence that supports the non-moving party's case.  Id.  In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

### III. **Legal Analysis**

At the outset, the Court notes that under Local Rule 7(h), every "motion for summary judgment must be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue . . . ." LcvR 7(h).  In addition, a party opposing a motion for summary judgment must file a "separate concise statement of genuine issues setting forth all material facts as to which it contends there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement."  LcvR 7(h). It is well-settled in this Circuit that a non-moving party's failure to submit such a statement will result in the court assuming that the "facts identified by the moving party in its statement of material facts are admitted."  Id.; see Interim Services Inc. v. Interim, Inc., 6 Fed. App. 12, 2001 WL 418068, at *1 (D.C. Cir. 2001) (concluding that "the district court . . . was within its discretion to assume that all the 'facts identified by the moving party in its statement of material facts are admitted'" if the non-moving party fails to submit a statement of disputed facts); SEC v. Banner Fund Int'l, 211 F.3d 602, 616 (D.C. Cir. 2000) (concluding that the district court was "justified in treating as admitted the SEC's statement of material facts" because the non-moving

party did not submit a statement controverting the moving party's statement).

Here, the defendant has filed a motion for summary judgment and has supported that motion with both a statement of material facts to which there is no dispute and evidence to support those facts.  The plaintiff, however, has failed to comply with the local rule and has not submitted with his opposition a statement of genuine facts which he contends are in dispute, nor any evidence, affidavits, or declarations to counter the defendant's statement.  Accordingly, this Court will, as provided by local rule 7(h), assume that the statement of material facts submitted by the defendant has been admitted to by the plaintiff.  See SEC, 211 F.3d at 616.  Thus, because there are no material facts in dispute,[5] the defendant is entitled to summary judgment if legally it is entitled to judgment in its favor.  See Fed. R. Civ. P. 56(c) (summary judgment is appropriate only if there are no genuine issue of material fact in dispute and the movant is legally entitled to a judgment).  This Court will now address whether the IBT is entitled to summary judgment on the plaintiff's claims that remained after the Court's earlier ruling dismissing all claims against the two other defendants and a number of counts against the IBT.

**(A)      The Plaintiff's Race Discrimination Claims**

The plaintiff's race discrimination claims are based on Title VII, 42 U.S.C. § 1981, and the DCHRA.  This Court has already dismissed the plaintiff's Title VII and § 1981 claims for employment actions that occurred prior to February 1998 as time-barred, because the plaintiff had failed to initiate this action within the requisite statute of limitations period.  See Kauffman, No. 01-1104, at 13.  Thus, the only remaining claims are the plaintiff's DCHRA claim and any

---

[5] To the extent that the plaintiff does attempt to rebut the factual assertions raised by the defendant, he does so by citing to his amended complaint.  Such citation to conclusory allegations without more is simply insufficient to defeat a summary judgment motion.  See Blackhawk Heating & Plumbing Co. v. Driver, 433 F.2d 1137, 1145-46 (D.C. Cir. 1970).

claims under Title VII or § 1981 which occurred after February 1998.  For the following reasons, this Court must conclude that the defendant is entitled to summary judgment on these remaining claims.

      (1)    The Plaintiff's DCHRA Claims

      In this Court's prior Memorandum Opinion, the Court held that the plaintiff's DCHRA's claims survived a dismissal motion, concluding that the "plaintiff may proceed with his DCHRA claim for adverse employment actions that allegedly occurred between 1994 and February 1998 if he can show a continuing violation until his March 1999 DCHRA wrongful termination claim." Kauffman, No. 01-1104, at 10.  For the reasons that follow, it is clear that the plaintiff has failed to establish a continuing violation and thus his claims under the DCHRA, with the exception of his wrongful termination claim, are untimely and accordingly must be dismissed.  Under the DCHRA, claims of discrimination or retaliation must be brought within one year of "the unlawful discriminatory act, or the discovery thereof."  D.C. Code § 2-1403.16; See Morgan v. Fed. Home Loan Mortg. Corp., 172 F. Supp. 2d 98, 105 (D.D.C. 2001) (citing D.C. Code § 2-1403.16; Paul v. Howard Univ., 754 A.2d 297, 311-12 (D.C. 2000)).  In this case, the plaintiff filed his complaint with the DCHRA on October 25, 1999.  Accordingly, only adverse employment actions that occurred or were discovered sometime after October 25, 1998, are actionable, unless this Court determines that the plaintiff has established that his claims warrant application of the continuing violation theory.  Thus, because his termination occurred on March 30, 1999, the plaintiff has an actionable DCHRA claim for that alleged discriminatory employment action.  The plaintiff contends, however, that all of his claims under the DCHRA survive because he has alleged a continuing violation of race discrimination.  Def.'s Opp'n at 11-

12.  This argument is unavailing.

In Nat'l Passenger R.R. Corp. v. Morgan, 536 U.S. 101 (2002), a former African-American railroad employee filed an action under Title VII alleging racial discrimination and retaliatory treatment by his employer.  Morgan,  536 U.S. at 104-05.  In addition, Morgan claimed that he had been subjected to a "racially hostile work environment throughout his employment."  Id.  In reversing the Ninth Circuit, the Supreme Court held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  Id. at 113.  "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify," and therefore "[e]ach incident . . . constitutes a separate actionable 'unlawful employment practice.'"  Id. at 114 (emphasis added).  Because of the continuing nature of hostile work environment claims, the Court clearly distinguished these types of claims from those involving discrete acts of discrimination.  Id. at 115.  As a result, the Supreme Court concluded that Morgan could only bring charges for discrete acts that transpired within the requisite time period, and the remaining untimely filed discriminatory claims were no longer actionable.  Id. at 114-15.  Although the District of Columbia Court of Appeals noted that it has not expressly adopted Morgan to hold that a continuing violation theory is unavailable under the DCHRA for cases involving discrete retaliatory acts, this Court agrees with another member of this Court that "it will do so when the occasion arises."  Coleman v. Potomac Elec. Power Co., 310 F. Supp. 2d 154, 160 (D.D.C. 2004); cf. Lively v. Flexible Packaging Ass'n, 830 A.2d 874, 876 (D.C. 2003) (en banc) (adopting "for cases filed under the DCHRA, the Supreme Court's hostile work environment analysis governing federal civil rights claims as it is set forth in Morgan").

In this case, the plaintiff has not asserted any hostile work environment claims.  Rather,

he cites a number of discrete discriminatory acts.  In fact, the plaintiff concedes that "[t]his case

shows a series of both <u>discrete</u> and <u>separate</u> acts of discrimination . . . ."[6]  Pl.'s Opp'n at 12

(emphasis in original).  Thus, the decision in <u>Morgan</u> does not provide any support for the

plaintiff's argument that a continuing violation theory salvages his untimely claims.[7]  Because the

acts the plaintiff alleged were all discrete acts of discrimination, this is simply not the type of

case which permits a finding of continuing discrimination to allow the plaintiff to avoid the

requirement that all claims be timely filed.  <u>See</u> <u>Morgan</u>, 536 U.S. at 114 (reversing the Court of

Appeals' application of "the continuing violations doctrine" to discrete acts of discrimination);

<u>see also</u> <u>Aceto v. England</u>, 328 F. Supp. 2d 1, 7 (D.D.C. 2004) (describing the distinction

recognized in <u>Morgan</u> between the hostile work environment claim and a discrete discriminatory

act); <u>Haynie v. Veneman</u>, 272 F. Supp. 2d 10, 16 n.3 (D.D.C. 2003) (indicating that hostile work

---

[6]  Specifically, the plaintiff alleges the following discrete and separate acts of discrimination: (1) reduction in pay; (2) loss of ERISA benefits; (3) job reassignment; (4) repeated retaliation; (5) termination and removal from the union; and (6) stray comments.  Clearly the first five alleged acts of discrimination are discrete acts as discussed in <u>Morgan</u>.  Arguably, "stray comments" could form the basis of a hostile work environment claim.  However, even if this Court would conclude that the "stray comments" asserted such a claim, it is clear that summary judgment would still have to be awarded to the defendant as "stray remarks . . . are insufficient to create a triable issue of discrimination where they are unrelated to an employment decision involving the plaintiff."  <u>Simms v. United States Gov't Printing Office</u>, 87 F. Supp. 2d 7, 9 n.2 (D.D.C. 2000).  It appears to the Court that all of the alleged "stray remarks" were made either by Ms. Callahan, a colleague of the plaintiff, and a secretary, neither who had a supervisory role over the plaintiff or participated in any employment decisions concerning the plaintiff.  Def.'s Mem. at 7-8.  Moreover, the "stray remarks" do not even concern the plaintiff's race.  Accordingly, it is clear that the defendant's summary judgment motion must be granted as to this claim also.

[7]  The plaintiff also posits that this Court should apply the doctrines of equitable tolling and waiver to permit his untimely claims because he was pursuing "intra-union remedies prior to seeking litigation."  Pl.'s Opp'n at 12.  This argument has no merit.  First, the defendant never waived a statute of limitations defense as to the plaintiff's DCHRA claims as it is clear that such a defense was raised in the defendant's earlier dismissal motion.  <u>Kauffman</u>, No. 01-1104, at 9; <u>see</u> <u>Smith-Haynie v. District of Columbia</u>, 155 F.3d 575, 578 (D.C. Cir. 1998) (holding that "an affirmative defense may be raised by pre-answer motion under Rule 12(b)").  Moreover, the plaintiff's equitable tolling argument is precluded by <u>Int'l Union of Elec., Radio & Machine Workers v. Robbins & Myers, Inc.</u>, 429 U.S. 229, 236-40 (1976), which concluded that the doctrine of equitable tolling should not be applied to Title VII claims if the filing of an action was delayed while the plaintiff pursued arbitration proceedings because the statutory claims and arbitration proceedings involved independent dispute mechanisms.

environment claims are qualitatively different from discrete acts of discrimination and that a

continuing violation theory could only be applied to hostile work environment claims);

Singletary v. District of Columbia, 225 F. Supp. 2d 43, 61 n.2 (D.D.C. 2002) (noting that

Morgan bars application of the continuing violation theory to discrete acts of discrimination).

Accordingly, only those claims which occurred or were discovered within one-year of when the

complaint in this case was filed are actionable, and the remaining claims must be dismissed as

time barred.

     (2)    The Plaintiff's Timely Claims of Race Discrimination

The only claim of employment discrimination which is actionable because it is not barred

by the statute of limitations is the plaintiffs's claim that he was terminated in violation of Title

VII, § 1981, and the DCHRA.  In evaluating claims under each of these provisions, courts

generally apply the same analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792,

802-03 (1973).  See Carney v. Am. Univ., 960 F. Supp. 436, 439 (D.D.C. 1997) (noting that the

same legal standard for retaliation governs both DCHRA and Section 1981 claims), aff'd in part,

rev'd in part on other grounds, 151 F.2d 1090 (D.C. Cir. 1998); RAP, Inc. v. Dist. of Columbia

Comm'n on Human Rights, 485 A.2d 173, 176 (D.C. 1984) ("this court generally follows the

Title VII analysis in discrimination cases brought under" the DCHRA).

Under the framework established in McDonnell Douglas, 411 U.S. at 792, to establish a

claim under Title VII of the Civil Rights Act of 1964 through indirect evidence,[8] the plaintiff

must first establish a prima facie case of discrimination.  Id. at 802.  A prima facie case of race

---

[8] The plaintiff here makes no attempt to argue that he has direct evidence of discrimination. Portis v. First Nat'l Bank of New Albany, 34 F.3d 325, 329 (5th Cir. 1994) ("In the context of Title VII, direct evidence includes any statement or written document showing a discriminatory motive on its face.") (emphasis added).

discrimination requires the plaintiff to show:  (1) that he belongs to a protected class; (2) that he applied and was qualified for a job that the employer was trying to fill; (3) though qualified, he was not selected; and (4) the unfavorable action supports an inference of discrimination.  Id. This is not an onerous burden.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  Once the plaintiff has satisfied this requirement, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the challenged employment decision.  Id. However, the employer is not required to support these reasons with objective evidence sufficient to satisfy the "preponderance of the evidence" standard.  Burdine, 450 U.S. at 259-60.

Once the defendant presents a legitimate, non-discriminatory reason for the challenged employment decision, then "'the McDonnell Douglas framework—with its presumptions and burdens'—disappear[s], and the sole remaining issue [is] discrimination vel non." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000) (internal citations omitted).  At this point, the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason.  See Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc).  Specifically, this Court must consider whether a jury could infer discrimination from (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation; and (3) any further evidence of discrimination that may be available to the plaintiff.  Waterhouse v. District of Columbia, 298 F.3d 989, 992-93 (D.C. Cir. 2002) (citing Aka, 156 F.3d at 1289).  The plaintiff need not present evidence in each of these categories in order to avoid summary judgment; rather, the Court must assess the plaintiff's challenge to the employer's explanation in light of the total circumstances of the case.  Aka, 156 F.3d at 1289-91.

Here, the only evidence the Court has before it is that the plaintiff is an African American male who was qualified for and held a position with the IBT, but was subsequently terminated. Arguably, this evidence fails to establish even a prima facie case of employment discrimination. However, viewing the evidence in the light most favorable to the plaintiff as this Court is required to do, it concludes that the plaintiff has satisfied the first requirement of McDonnell Douglas. However, the plaintiff has come forward with no evidence to support a conclusion that the legitimate, non-discriminatory reason for plaintiff's termination was a pretext for discrimination. The defendant postulates that the plaintiff was terminated (along with 125 others) because of a change in the IBT's administration when a new president was elected. Def.'s Mem. at 9. Specifically, the defendant asserts that the new IBT president wanted to have only people serving on his staff that "he could be confident would effect his policies in the union." Id. Thus, because neither the new IBT president nor his staff knew the plaintiff, he was terminated. Id. The plaintiff has made no effort to provide any evidence to challenge the defendant's legitimate, non-discriminatory reason for the plaintiff's termination other than to reassert the evidence which supports his prima facie case. This simply falls short of the mark set by the McDonnell Douglas framework. Accordingly, this Court is compelled to grant the defendant's motion as to this claim. See Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting McCoy v. WGN Cont'l Broad. Co., 957 F.2d 368, 373 (7th Cir. 1992) ("Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers.'").

14

**(B)**     **The Plaintiff's Claims under the LMRDA**

The plaintiff alleges that the IBT engaged in several violations of sections 101 and 609 of the LMRDA.   Despite citing a number of provisions of the LMRDA, the plaintiff has essentially advanced three claims.   First, the plaintiff claims that the LMRDA was violated when his housing allowance was eliminated.   Compl. ¶ 205.   Second, the plaintiff asserts that he was terminated for failing to make election contributions to the campaign of Ron Carey in violation of the LMRDA.   Compl. ¶¶ 203-08.   In addition, the plaintiff posits that the defendant violated the LMRDA when it refused to process his grievances concerning (1) his leave of absence and (2) his right to continue to receive pension contributions.   Compl. ¶¶ 202, 209-10.

This Court recognized in its prior memorandum opinion that "[t]ypically, the LMRDA does not protect union members against actions taken against them as a result of their employment status with the union." Kauffman, No. 01-1104, at 16.   Nevertheless, this Court found that the plaintiff's LMRDA claims survived the earlier dismissal motion because it concluded that the plaintiff had a valid cause of action if the alleged employment action directly interfered with his rights as a union member. Id. at 18.   And, the plaintiff had alleged that the defendant terminated him because he exercised his free speech right when he refused to participate in union politics. Id.   On the summary judgment motion currently before the Court, however, this Court must find for the defendant.

The LMRDA, and particularly Title I of the LMRDA, was established to provide union members the right to freedom of expression without fear of sanctions by the union. See Finnegan v. Leu, 456 U.S. 431, 435 (1982).   Under sections 101(a)(1) and (2), for example, all members of the union have equal voting rights and rights of speech and assembly. Id.   And, section 609

makes "it unlawful for a union or its representative 'to fine, suspend, expel or otherwise disciple

any of its <u>members</u> for exercising any right to which he is entitled under the provisions of [the

LMRDA]." <u>Id.</u> at 436 (emphasis in original).  As the Supreme Court noted, "[i]t is readily

apparent, both from the language of [sections 101(a)(1), 101(a)(2), and 609 of the LMRDA] and

from the legislative history of Title I [of the LMRDA], that it was the rank-and-file union

members—not union officers or employees, as such—whom Congress sought to protect."

<u>Finnegan</u>, 456 U.S. at 436-37.  Thus, the Court concluded that "Title I [of the LMDRA] does not

bar removal of policymaking union officials because such removal was 'only an <u>indirect</u>

interference with their membership rights.'"  <u>Franza v. Int'l Bhd. of Teamsters, Local 671</u>, 869

F.2d 41, 45 (2d Cir. 1989) (quoting <u>Finnegan</u>, 456 U.S. at 440).  In fact, the Second Circuit has

noted that it does not matter the type of position in the union (policy making or otherwise) the

member holds as "it is not a member's employment by the union that is protected by Title I; rather

it is his membership in the union that is safeguarded." <u>Franza</u>, 869 F.2d at 47.  Thus, only

employment actions that directly interfere with a union member's rights are actionable under

section 102.  <u>Id.</u> at 47-48.

  As an appointed IBT employee, <u>Finnegan</u> prevents the plaintiff from pursing his claims

that the elimination of this housing allowance violated the LMRDA because there is simply no

evidence that his rights as a member of Local 177 were impacted by the elimination of the

housing allowance.  Moreover, there is simply no factual basis for the plaintiff to contend that he

was terminated in violation of the LMRDA for participating in a protected activity, namely, his

refusal to contribute to the presidential campaign.  Section 609 of the LMRDA clearly prohibits a

union from disciplining a member for that member's involvement in free speech activities.

However, to support a claim for such a violation, the plaintiff must present some evidence which shows that he was terminated for exercising his free speech rights.  See Casumpang v. Int'l Longshoremen's & Warehousemen's Union, 269 F.3d 1042, 1058 (9th Cir. 2001) (requiring a causal connection between the alleged adverse employment action and the protected activity under the LMRDA as also required by Title VII); Milne v. Int'l Ass'n of Bridge, Structural, Ornamental & Reenforcing Iron Workers, 156 F. Supp. 2d 172, 182-83 (D. Conn. 2001) (finding no violation of the LMRDA where there was no causal connection between the union's disciplinary action and the members' protected activity).  In sum, there must be some evidence of a causal link between the alleged unlawful employment action and the protected activity.  In this case, there is simply no evidence to establish any type of causal link between the plaintiff's termination and the failure of the plaintiff to donate money to the Carey campaign.[9]  In fact, as this Court noted in its earlier opinions, it is ironic that the plaintiff is asserting that he was terminated by the incoming administration because of his failure to contribute to the campaign of the new president's opponent.  Kauffman, No. 01-1104, at 18 n.8.  Accordingly, the defendant is entitled to summary judgment on the plaintiff's LMRDA claim.[10]

---

[9]  While the crux of the plaintiff's position, as stated in the complaint, is that he was terminated for not donating to the Carey campaign, compl. ¶¶ 51, 63, 66, 73, 81, 98, 103, it appears he might now be alleging that he was also terminated because he did not donate to the Hoffa campaign.  Pl.'s Opp'n at 15.  Despite this new assertion, the plaintiff has still failed to offer any evidence (even circumstantial) showing that his termination was due to his refusal to make financial contributions to the election.

[10]  In addition, this Court can find no legal authority, and the plaintiff has not provided any, which would permit the plaintiff to pursue a claim against the IBT under the theory that the IBT failed to comply with the grievance process established in the collective bargaining agreement.  Compl. ¶ 210.  First, the IBT is not a party to the collective bargaining agreement and there is no authority provided to the Court that the IBT has an obligation even to comply with the collective bargaining agreement.  The plaintiff attempts to rely on Brown v. Volante, 194 F.3d 351 (2d Cir. 1999) for the proposition that the IBT is bound by the collective bargaining agreement between Local 177 and the plaintiff.  Reliance on this case, however, is simply misplaced as that case stands only for the proposition that an employer's conduct could demonstrate an intent to be bound by a collective bargaining agreement

(continued...)

**(C)    The Plaintiff's ERISA Claims**

Section 510 of ERISA states that

[i]t shall be unlawful for any person to discharge, fine suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefits plan . . .  or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

29 U.S.C. § 1140.  The plaintiff seeks to "recover benefits due to him under the terms of his plan,

to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the

terms of the plan."  Compl. ¶ 213.  To establish a claim under § 510, "the plaintiff must show, by

a preponderance of the evidence, that his employer was motivated by an intent to interfere with

his right to the benefits under the employee benefits plans in which he was a participant."  Phelps

v. Field Real Estate Co., 793 F. Supp 1535, 1542 (D.Colo. 1991); see May v. Shuttle, Inc., 129

F.3d 165, 169 (D.C. Cir. 1997).  To make this determination, courts generally employ the

traditional three-prong test from McDonnell Douglas, which this Court has already set forth

above.  Phelps, 793 F. Supp. at 1542 (citing Gavalik v. Cont'l Can Co., 812 F.2d 834 (3rd Cir.

1987) and Dister v. Cont'l Group, Inc., 859 F.2d 1108 (2nd Cir.1988)).

In this case, assuming for the sake of argument that the plaintiff has established a prima

facie case for a violation of § 510, the plaintiff has put forth no evidence to demonstrate that the

defendant's articulated reason for his discharge was a pretext for the attempt to actually protect

---

[10](...continued)
even if the agreement was not signed.  Brown, 194 F.3d at 355-56.  That is simply not the case here.  Moreover, it is clear that a claim against a union for failing to process a meritorious grievance is properly pleaded as a federal common law claim for breach of the duty of fair representation, not as an LMRDA claim.  See Del Costello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 165 (1983).

the pension fund.  Here, the plaintiff was terminated because of a change in administration.  The

plaintiff has not directed this Court to any evidence that supports a conclusion that the IBT was

"motivated by an intent to interfere with his right to the benefits under the employee benefits

plans in which he was a participant."  Phelps, 793 F. Supp. at 1542.  In fact, a close review of the

evidence presented to this Court demonstrates there was no financial or other motive for the IBT

to terminate the plaintiff.  The evidence establishes that the trustees of the Local 177 plan decided

that the plaintiff was ineligible for benefits and that the IBT had no legal obligation to contribute

to the plan.  Def.'s Mem., Ex. 4 (letter advising the plaintiff of his ineligibility to participate in

Local 177's pension plan while employed at the IBT).  Moreover, the plaintiff participated in the

IBT pension plan and the plaintiff concedes that the IBT made all the required contributions into

that plan.  See Def.'s Mem., Declaration of Patrick Szymanski ¶ 13 ("Szymanski Decl."); Def.'s

Mem. Kauffman Transcript at 50-51.  Accordingly, the Court must grant the defendant's summary

judgment motion as to this claim.

**(D)     The Plaintiff's Claim for Breach of the Covenant of Good Faith and Fair Dealing**

In addition to the aforementioned claims, the plaintiff also alleges that the defendant

breached its duty of good faith and fair dealing it owed to him under Aricle 60 Section 1 of the

Local Supplemental Agreement to "receive the same consideration, benefits and other rights[,]

including pension rights as other UPS employee members of the bargaining unit."  Compl. ¶¶ 21,

189.  Moreover, the plaintiff argues that his attempts to "file grievances though the channels

provided for under the IBT constitution and contracts to which he was a party by reason of his

union membership" were ignored.[11]  Id. ¶ 191.

It is well-settled that "District of Columbia law does not recognize a claim for breach of an implied covenant of good faith and fair dealing when brought by an at-will employee."  Kerrigan v. Britches of Georgetowne, Inc., 705 A.2d 624, 627 (D.C. 1997) (quoting Gomez v. Trs. of Harvard Univ., 676 F. Supp. 13, 15 (D.D.C. 1987)).  However, "[t]he presumption that a hiring unaccompanied by an expression of time is at will can be rebutted by circumstantial evidence that the parties intended employment to be for a fixed period."  Wash. Welfare Ass'n v. Wheeler, 496 A.2d 613, 615 (D.C. 1985) (quoting Sullivan v. Heritage Fdn., 399 A.2d 856, 860 (D.C. 1979)).  This claim survived the defendant's earlier dismissal motion because the plaintiff alleged that his employment was governed by several employment contracts, including a collective bargaining agreement.  Based upon the record presented to the Court now, the plaintiff's claim cannot survive the defendant's current motion.

First, the evidence presented to the Court clearly establishes that the plaintiff was an at-will employee.  Kauffman Tr. at 28; Def.'s Ex. 7 (Plaintiff's Response to Interrogatories) at 4.  In fact, the plaintiff himself admitted that his employment with the IBT was not for a specified period of time.  Kauffman Tr. at 28.  Moreover, the constitution of the International Brotherhood of Teamsters, which the plaintiff alleges supports his argument that he was not an at-will employee, Def.'s Ex. 7 (Plaintiff's Response to Interrogatories) at 4, specifically states that "[t]he General President, when he deems it for the best interests of the International Union, is hereby empowered to remove any International Representative or General Organizer."  Def.'s Ex. 1 at 48.

---

[11]  This Court previously concluded that it should exercise pendent jurisdiction over this "local" law claim.  See Kauffman, 01-1104, at 21-22.

Rather than supporting his position, this provision in the IBT constitution directly refutes it.  The

plaintiff has simply put forth no evidence to establish he was anything other than an at-will

employee of the IBT.  See Jankins v. TDC Mgmt. Corp., 21 F.3d 436, 443 (D.C. Cir. 1994)

(concluding that employment was at-will because the parties did not clearly express the duration

of the employment even if the parties discussed the employment as "permanent").  Accordingly,

the defendant is entitled to summary judgment on this claim as well.[12]

### IV.   Conclusion

For the foregoing reasons, the defendant's motion for summary judgment must be granted

and this case must be dismissed.

**SO ORDERED** this 24th day of May, 2005.[13]

REGGIE B. WALTON
United States District Judge

---

[12]   To the extent that the plaintiff attempts to rely upon collective bargaining agreements to establish that his employment was not at-will, Def.'s Ex. 7 at 4, he has failed to provide this Court with those agreements.  Thus, the plaintiff has not put forth any evidence to refute the defendant's arguments to the contrary.  However, even if those agreements were before the Court, it is likely that this claim would be preempted by federal labor law.  The Supreme Court made it abundantly clear in Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 405-06 (1988), that if the resolution of a state-law claim depends upon the interpretation and meaning of a collective bargaining agreement, the state law is preempted and federal labor law principles must be employed to resolve the dispute. Id.; see also International Broth. of Elec. Workers, AFL-CIO v. Hechler, 481 U.S. 851, 859 (1987) ("Inasmuch as federal law must control uniform meaning given to contract terms in collective bargaining agreement, employee's state tort action that necessarily rests on interpretation of those terms is preempted by § 301(a)" of the LMRDA.) (citing Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 218-19 (1985)).  For example, in Allis-Chalmers Corp, 471 U.S. at 213-16, the Court, after "examining the collective-bargaining agreement, and determin[ing] that it provided the basis not only for the benefits, but also for the right to have payments made in a timely manner," the plaintiff's claim was subsumed by Section 301.  Lingle, 486 U.S. at 405 (citing Allis-Chalmers Corp., 471 U.S. at 213-16); see also  Bd. of Trs. of Hotel & Rest. Employees Local 25 v. Madison Hotel, Inc., 97 F.3d 1479 (D.C. Cir. 1996).  Therefore, even assuming that the collective bargaining agreements would support the plaintiff's argument that his employment was not at-will, the validity of this argument would inevitably rest on the terms and interpretation of the collective bargaining agreements.  Thus, the state law claim would be preempted by federal law.

[13]   An Order consistent with the Court's ruling accompanies this Memorandum Opinion.